# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

## BELMONT v. McALLISTER.

### March 19, 1914.

1. APPEAL AND ERROR—*Specification of Errors in Petition.*—The petition for a writ of error in this case points out specifically the errors claimed to have been committed by the court below, and in such manner as to enable this court and the opposing counsel to see on what points counsel for the petitioner intends to seek a reversal, and hence is sufficient.

2. CONTRACTS—*Mutuality of Agreement.*—A contract to be valid and enforceable must be so certain that each party may have an action upon it, and to constitute a complete contract the minds of the parties must meet in mutual agreement on every material phase constituting the alleged agreement.

3. COUNSEL FEES—*Excessive—Case at Bar.*—The evidence in the case at bar fails to establish any contract for the counsel fees recovered in the court below, and on a *quantum meruit* the recovery is far in excess of what is warranted by the evidence.

Appeal from a decree of the Circuit Court of Bath county. Decree for the complainant. Defendant appeals.

*Reversed.*

The opinion states the case.

*Munford, Hunton, Williams & Anderson,* for the appellant.

*Harmon & Walsh* and *A. W. Patterson,* for the appellee.

CARDWELL, J., delivered the opinion of the court.

In April, 1909, Joseph T. McAllister, an attorney at law, filed his bill in this cause against Mrs. Alva E. Belmont, a resident of the State of New York, but owning a tract of land of about 250 acres, situated in Bath county, Virginia, which the plaintiff had caused to be attached in this proceeding; the purpose of the bill being to enforce the payment of three distinct debts alleged to be owing from the defendant to the plaintiff—(1) for services rendered by the plaintiff as attorney in probating, in the Circuit Court of Bath county, Virginia, the will of O. H. P. Belmont, the defendant's deceased husband, which had been theretofore probated in New York city, the domicil of the testator; (2) for services and advice relative to the custody and rights over defendant's grandchildren, children of W. K. Vanderbilt of New York; and (3) for breach of contract of employment of the plaintiff to manage the tract of 250 acres of land in Bath county, near Hot Springs, Va., acquired by the defendant under the will of her deceased husband.

The bill, after setting out the residence of the defendant to be in the State of New York, and that she owns said tract of land in Bath county, Va., avers that at various times defendant employed plaintiff to perform for her in his capacity as an attorney and otherwise certain services; that on the 10th of October, 1908, plaintiff, at defendant's request, procured the will of her late husband, O. H. P. Belmont, to be probated in the county of Bath, and that a proper fee therefor would be $100.00; that on the day and year aforesaid, plaintiff advised defendant in regard to the legal custody of her grandchildren, and that a proper fee for said advice would be $250.00; and that afterward, towit, on the day and year aforesaid, defendant requested plaintiff to undertake for her the development and sale of the land aforesaid, situated about 2½ miles from the Homestead

hotel of the Virginia Hot Springs Company, on the
boulevard leading from Hot Springs to Warm Springs;
that said land is susceptible of division into lots for
villas and cottages, but for such purpose it was lacking
in water and sewer facilities; that with acquisition of
such facilities it would be greatly enhanced in value, and
the sub-divisions aforesaid would be greatly in demand
and could be readily sold for a large price; and that for
the successful development of said land it was further
necessary that it should be attractively advertised.    It
is further averred that said matters were discussed be-
tween plaintiff and defendant, and that defendant re-
quested plaintiff to undertake the development and sale
of said land, and in consideration of said services, prom-
ised to pay plaintiff a reasonable compensation; that in
pursuance of said understanding, plaintiff had the land
surveyed and sub-divided into suitable lots, with neces-
sary roads and streets located thereon, and made the
proper contracts for water and sewerage, and procured
wide-spread advertisement to be made of the sale of said
land; that in and about the services and work plaintiff
expended a large sum of money, to-wit, $828.32; that de-
fendant paid plaintiff the sum of $750.00 of said expense,
but refused to permit plaintiff to execute further the
aforesaid agreement in regard to the development and
sale of said property, while plaintiff had been and was
still willing to carry out the agreement on his part, and
plaintiff says, "that the amount he believes he is justly
entitled to recover against the defendant is $12,928.32,
at least, with interest thereon from the first day of Feb-
ruary, 1909, and prays for an attachment against de-
fendant's said property in Bath county and for general
relief.

On the 21st of May, 1909, defendant filed her answer
to the bill, in which she admits that she is a non-resident

of Virginia, and that plaintiff procured the will of her deceased husband, to be probated in Bath county, Va., and that he gave her advice relative to the custody of certain of her grandchildren, but denies that she owed him anything whatever on account of said service and advice, averring that payment therefor had been made to the plaintiff. Defendant also admits in her answer that plaintiff did certain work in connection with the attempted sale of certain premises (the 250 acres of land) owned by her in Bath county, but alleges that she has already paid plaintiff for all sums expended by him in this particular, and denies positively that she owes him anything for this item of his bill of complaint. She also specifically and emphatically denies that plaintiff was authorized, empowered or directed to develop said lands as alleged in his bill, and states that plaintiff was simply consulted by her in reference to the sale of said property; that he himself suggested the development of said property, and urged defendant to have the same done, but she never authorized him to make the developments alleged in his bill. Defendant further states that if the alleged improvements to her property were made, it was without her knowledge or consent, and without authority from her directly or indirectly, and denies that she ever ratified any acts of the plaintiff in his so-called developments of said property. She further states that the understanding between her and the plaintiff was that he should be paid a reasonable commission on the sale of any of said property that he might sell for her, but that he failed to make any sale, and she was still ready and willing to pay him a reasonable commission on any sale brought about through his efforts. Finally, defendant, again denying emphatically that she owes plaintiff anything, alleges that he has been fully paid for all services rendered, advice given, or money expended by him on her account.

Upon a hearing of the cause on the proceedings had on the order of publication, etc., the bill of complaint, the answer of the defendant thereto, and depositions taken and filed in behalf of the respective parties, the circuit court entered its decree of May 15, 1912, in favor of the plaintiff, adjudging that he recover of the defendant the sum of $11,928.32, with interest from April 1, 1909, till paid, and costs, from which decree the defendant obtained this appeal.

It appears from a written opinion of the learned judge of the lower court, made a part of the record and of said decree, that the aggregate of the recovery decreed in favor of the plaintiff, appellee here, and against the appellant, defendant below, towit, $11,928.32, is made up of the following separate and distinct amounts: (1) $100.00 for services of appellee in probating in Bath county, Va., the will of appellant's deceased husband; (2) $250.00 for advice concerning the custody of appellant's grandchildren; (3) $4,000.00 for the personal services of appellee in connection with the work done towards providing a plan for the development of appellant's land near Hot Springs into an exclusive residential park; (4) $7,500.00 as compensation to appellee for damages sustained by him as the result of appellant's breach of an alleged contract with him for the development of said land into a park to be known as Belmont Park; and (6) $78.32 balance due appellee on account of expenditures made by him "in the enterprise."

In other words, the decree finds appellee to be entitled to his charges for services in probating the will of appellant's deceased husband and for advice to her concerning the custody of her grandchildren; that a contract was made between appellant and appellee for the development of her land near Hot Springs under the management and direction of appellee, and that he is

entitled to $4,000.00 as compensation for his services performed in that connection; and also to $7,500.00 as damages resulting to him by reason of the failure or refusal on the part of appellant to complete the undertaking.

In his brief filed in October, 1913, more than one year after this appeal was granted and six months after the lapse of one year in which the appeal could be taken, appellee submits a motion to dismiss the appeal for want of assignments of error in the petition as required by section 3464 of the Code, and Rule II of this court.

The statute requires that a petition for an appeal, writ of error or supersedeas shall assign errors, the purpose of which requirement, and of the said rule of this court, is to enable the court and opposing counsel to see on what points the petitioner's counsel intend to seek a reversal of the judgment or decree and to limit the discussion of the case here to those points. *First Nat'l. Bank* v. *Trigg Co.,* 106 Va. 327, 56 S. E. 158, 7 L. R. A. (N. S.) 744; *Orr* v. *Pennington,* 93 Va. 268, 24 S. E. 928; *N. & W. Ry. Co.* v. *Bondurant,* 107 Va. 515, 59 S. E. 1091, 15 L. R. A. (N. S.) 443, 122 Am. St. Rep. 867.

In the case at bar the petition for the appeal, after referring to the decree complained of and reciting the facts, says: "It is respectfully submitted that the record will show that said decree is plainly erroneous and contrary to the law and the evidence." Then the petition proceeds to an examination of the evidence as contained in the record and the law applicable thereto, and concludes with a concise statement of the specific grounds on which a reversal of the decree is asked, viz: (1) That the decree is plainly contrary to the law and the evidence in so far as it decrees that there was a contract between the parties to this litigation on any subject whatsoever, and especially that there was a contract for the compensation of the plaintiff for the alleged services rendered

by him; (2) That the decree is erroneous in that even if such agreement existed, or the plaintiff shows a right to compensation on any ground whatever, all of which is denied, yet the amount allowed the plaintiff for alleged services was excessive and contrary to law and good conscience, and therefore erroneous; (3) That the decree is erroneous in allowing the plaintiff any amount by way of damages for alleged breach of contract on any basis whatever, and especially on the basis of what he might have received had the property been developed according to his ideas, at the expense of the defendant, and had sales been made as set out in the testimony; (4) That the decree is erroneous, since, if anything could have been allowed on this account as a matter of law, which is denied, yet the amount allowed is grossly excessive and contrary to law and good conscience.

The foregoing statement, appearing in the petition, is sufficient to point out specifically the errors claimed to have been committed by the court below, and to enable this court and opposing counsel to see on what points counsel for the petitioner intended to seek a reversal of the decree; and, therefore, the motion of appellee to dismiss the appeal is overruled.

Coming then to the consideration of the several items of the claim asserted by appellee in his bill, and which enter into the aggregate amount decreed him against appellant by the decree complained of, the first is for services in connection with the probate of the will of O. H. P. Belmont, deceased, in the Circuit Court of Bath county, amounting to $100.

Appellant was the sole beneficiary under the will of her husband, who was a resident of New York, where his will had been duly probated, but there being property in Virginia it was desired to probate the will in Bath county, where this property was located, and ap-

pellee alleges in his bill that this was done on the 16th day of October, 1908, and claims that $100 was a reasonable charge for his services in that connection. Appellant admits in her answer that appellee procured the will for probate in Virginia, does not deny the reasonableness of the charge made against her for this service, but says that he was paid ''a yearly retainer for services and advice and consultation, which certainly covered the said two items of complainant's bill so far mentioned in this answer,'' meaning the charge of $100.00 for probating the will in Bath county and the charge of $250 for ''certain advice in regard to the question as to the rights to the custody of certain of the respondent's grandchildren.''

It appears that appellee was paid by O. H. P. Belmont a yearly retainer for at least two years, and appellee admits that a yearly retainer was charged by him against Belmont in March, 1908, within six months of the time at which he probated this will, but whether this retainer was for the year following its payment or for just what period does not appear in the record. We are, therefore, unable to say from the record that the circuit court erred in allowing appellant the claim of $100 made by him for services in procuring the probate of said will in Bath county, and will pass from that point of contention to the next, which is with respect to the allowance to appellee of the sum of $250 for advice concerning the custody of appellant's grandchildren.

The right to recover of appellant the amount of this charge is asserted in appellee's bill, but denied in appellant's answer. Neither in the bill nor in the answer thereto are the facts and circumstances under which the alleged advice was given stated. So that the evidence is to be looked to in determining the justice of appellee's demand for compensation for this alleged service, and

we shall not undertake to set out the evidence at length, which consists of the testimony given by the parties as witnesses for and in behalf of themselves with respect to this transaction, since there is no material difference between them as to the circumstances under which the alleged advice was given.

Appellee says that the occasion of the advice was at the Hot Springs hotel, before he and appellant started on their drive to Bath county court house for the purpose of probating the will of O. H. P. Belmont, deceased, while appellant says that whatever advice appellee gave her concerning the custody of certain of her grandchildren was given in a casual conversation between them in their conveyance when en route to Bath court house, which difference of statement we regard as immaterial. Tersely stated, the facts as to this alleged advice by appellee to appellant are as follows: Appellee had been for some time past under the retainer of appellant's husband, who had just died. He was then about to start or was en route, accompanying appellant, to Bath court house to probate the will of her late husband, for which service he has made a separate charge of $100, and, as is admitted, in a conversation at the hotel before starting on their journey, or while on the drive of five or six miles, the question as to the right of control and custody of certain of appellant's grandchildren was discussed. Obviously, appellant had no control of her grandchildren, and it is not even claimed that her rights with respect to the control or custody of these children were discussed at all. These children were the children of appellant's son, Wm. K. Vanderbilt, and his then wife, both citizens and residents of the State of New York, and their rights with respect to the children were manifestly controlled by the laws of that State. It is equally manifest, upon the facts not controverted, that appellant could have

had no interest, in the sense of a client consulting an attorney, in the subject matter of this casual conversation, in which she had no legal rights nor proposed to assert any, but was merely having reference to a possible controversy between the parents of these children over their rights with respect to the control and custody of their children. So that, if appellee undertook to advise her at all with respect to the question discussed, necessarily his advice was that the laws of New York controlled the matter. Appellee, according to his own admission, did not undertake to tell appellant what the laws of New York were on the subject, and the only advice he gave was in this desultory conversation, either at the hotel at Hot Springs, or along the road to Bath court house, and after stating what he understood the law to be in Virginia, he "presumed the law would be the same in New York. That was the best I could do for her under the circumstances."

Since appellee admits that in this conversation he did not know at the time the laws of New York, and that the best he could do for appellant under the circumstances was to tell her that he presumed the laws of New York were the same as those in Virginia, it is but fair to assume that he did not at the time think that he was giving legal advice on which his client would be expected to act or could act. In these circumstances there was no foundation for the claim made by appellee in his bill for a recovery of $250 from appellant for advice to her "in regard to the custody of certain of her grandchildren," and, therefore, the decree of the circuit court allowing a recovery on this demand is erroneous.

The next question presented relates to the allowance in the decree of the circuit court of $4,000 to appellee for services, legal and otherwise, alleged to have been rendered appellant by appellee in furtherance of a plan

which provided for the development of the land of appellant near Hot Springs into an exclusive "residential park."

It appears from the record that this plan for the development of appellant's tract of 250 acres of unimproved land into an exclusive "residential park" originated solely in the mind of appellee, and, therefore, the question is whether or not there was a contract, either express or implied, between him and appellant upon which his demand for services, to the amount of $5,000, alleged to have been rendered, can be legally based. It is true that appellant, while a visitor at the Hot Springs hotel in October, 1908, and upon the suggestion of her friend, Dr. Pole, with whom she had a talk about selling the land, sought and had an interview with appellee with reference to its sale, but at this interview and perhaps another, the matter was only discussed and nothing definite was agreed on, except that appellant desired to sell the land, and appellee was willing to give his attention to devising a plan by which to accomplish that result; so that we have to look into what thereafter transpired between the parties in order to determine whether or not there was a contract entered into between them whereby appellee became entitled to recover of appellant for services rendered in the carrying out of the contact on his part—that is, whether there was a contract with respect to which there was a meeting of the minds of the parties with sufficient clearness and definiteness in its terms to enable the court to determine just what was the agreement. There being, as is admitted, no written agreement between the parties at any time, and they being the only persons who were cognizant of the facts, their testimony furnishes the basis of the contract relied on by appellee.

In the bill of complaint, after reciting ownership of the

tract of land by appellant, and that it was then only used for pasturage, and required certain improvements in order to be salable for residential purposes, it is stated: "These matters were fully discussed between the complainant and defendant and she . . . requested complainant, for her and in her behalf, to proceed forthwith to undertake the development and sale of said land in such subdivisions and to have the necessary surveys and engineering work made and performed for the subdivision of said land as aforesaid, and also to procure a water supply and sewer rights for said land, and to advertise the same for sale, and then and there promised and agreed, in consideration that the said complainant would undertake the said service, that she, the said defendant, would pay the expenses necessary to be incurred in the premises, and would pay complainant reasonable fees and emoluments for the development of said property, and that he should have the opportunity and exclusive right to sell the land and to receive reasonable compensation and emoluments therefor. This offer complainant then and there accepted and forthwith set about performing the service aforesaid." The bill then recites that the services contemplated in the agreement were performed by complainant and makes claim for compensation therefor.

An analysis of the statements of the bill of complaint shows that complainant (appellee) claims that the contract for his employment by appellant was for the following purposes: (1) To undertake the development and sale of the land in subdivisions; (2) to have necessary surveys and engineering work done for subdivisions of the land; (3) to procure a water supply and sewer rights; (4) to advertise the land for sale. As to the undertakings of appellant the claim in the bill is that she was (1) to pay expenses incurred in the premises; (2) to pay ap-

pellee reasonable fees and emoluments for the develop-
ment of the property; and (3) to give appellee exclusive
right to sell the land and to receive compensation there-
for.

That part of appellant's answer to the material alle-
gations of the bill with respect to the alleged contract is
as follows: "Respondent specifically denies that the
complainant was authorized, empowered or directed to
develop the said land as alleged in his bill of complaint,
but was simply consulted by this respondent in refer-
ence to the sale of said property, and the complainant
suggested himself the development of the property, and
urged and entreated respondent to have the same done,
but respondent emphatically denies that she ever author-
ized, directed or empowered the complainant to make
the developments alleged in his bill of complaint, that if
the same was done it was done without her knowledge or
consent, and that if done the said complainant never had
authority from respondent either directly or indirectly
to make the development alleged in his bill, and respon-
dent further denies that she ever ratified any acts of com-
plainant in his so-called developments on said property,
and therefore denies that she owes him one cent for this
item in his bill of complaint." It is further stated in
her answer, that the only understanding between herself
and appellee was that if he sold the land he would be
given a reasonable commission for making such sale;
that he had never made any sale thereof, and was there-
fore not entitled to the compensation demanded, or any
compensation, for his alleged efforts in that direction.

The deposition of appellee in the case was taken on
August 4, 1910; that of appellant on March 29, 1912; and
on April 17, 1912, appellee was recalled and examined
on his own behalf in rebuttal. Upon the proof afforded
by these depositions and the exhibits therewith filed ap-

pellee necessarily has to rely, and does rely, to sustain the contract alleged in his bill, and by virtue of which he makes claim to compensation for services and for damages resulting to him from the breach of the contract on the part of appellant.

It would be impossible to review in an opinion of reasonable length the various and variable statements made by the parties in their depositions taken in the case, nor do we consider it necessary. A careful examination of the record discloses that while appellant desired to sell her said tract of land near the Hot Springs, and desired that appellee, who had purchased and acquired the title to the land for her husband, should have charge of the sale thereof and receive a compensation for his services in that connection, and authorized a survey of the land, certain repairs to fences thereon and the acquisition of certain water rights and sewerage privileges, suggested by appellee as helpful in effecting a sale of the property, she never at any time authorized, empowered or directed appellee to develop the land as alleged in his bill of complaint.

After he had stated in detail what was said in two interviews between him and appellant in the month of October, 1908, in regard to disposing of this property; that he then called appellant's attention to the need of certain repairs and a survey and plat of the property, the probable costs thereof; that he had the repairs and survey made, and rendered her a bill covering the several items, amounting to $218.61 for which she gave him a check; that in their talks appellant asked him if he had ever been to Tuxedo Park, and he replied that he had not; that on November 8, 1908, he went to Tuxedo Park, where he looked into the way in which that property had been developed, etc., etc.; that he saw appellant at her home in New York on November 11, 1908, and took up

with her the question of developing the property as a park, approximating the lines of development at Tuxedo. He was asked to state whether any agreement was reached with appellant as to the amount of compensation for services in this matter, to which he replied: ''There was no definite agreement in regard to this. But it was distinctly understood that I was to have charge and be responsible for the development of the land, and to be wholly responsible for putting it on the market and making sale, of course subject to her approval in these matters, and I had every reason to expect, and know that she contemplated, that I was to be well compensated for such services.''

Then after stating in detail his version of the alleged agreement between himself and appellant, and what he did with respect to the development of the property, among which he had a survey made by a Mr. Richardson, showing plans for platting the property into separate lots and sites for residences, which carried with it also plans for further developments, all of which involved large expenditures of money aggregating at least $40,000 appellee testified as follows:

''Q. State whether or not Mrs. Belmont had agreed with you in the beginning that she would incur these expenses in this development? A. Mrs. Belmont directed me to announce the fact that she would convert the property into a park, and directed me to have the surveying done, presumably to show what was needed. I cannot state that anything was said in the matter of just what expenses were to be paid or would be necessary, but the development of the park necessarily required expense, and she could not have thought otherwise. Nothing else was thought of except whatever was necessary to be done to carry out the purpose that she had me to announce would be done. There are some features submitted by

Mr. Richardson that she might think unnecessary to do, as a matter of fact in the reservation of land shown on the map. At the time Mrs. Belmont examined the map made by Mr. Richardson it was her idea that some of these reserved spaces should be thrown into lots and not held as reserved land.''

''Q. Did you submit to Mrs. Belmont a statement of what expenditures in your judgment it would be necessary to make in order to be in a position to make sale of lots? A. I submitted to Mrs. Belmont the estimates furnished by Mr. Richardson. I am not sure whether these estimates were submitted to Mrs. Belmont or not. But after learning through Mr. McMahon of her apparent change of attitude toward the park matter, I submitted to her a proposition dated December 22, 1908, in which was set forth certain expenditures that would be necessary to carry out the matter as then shaped up.''

Not only is the proposition submitted by appellee to appellant on December 22, 1908, entirely inconsistent with the alleged contract which he claims then existed, but he makes no reference to any such contract. Not only does appellee admit in another part of his deposition that although advised himself as to the approximate cost of the development of the property along lines contemplated by him, Richardson having said that the cost would be $41,385.00, he had not in any of his talks with appellant given her any information whatever as to the cost of the development contemplated, but he gives as a reason for not giving appellant this information his assumption that with her experience in the work of developing property, and having done a great deal of landscape gardening under her own supervision, she would know about the approximate cost of things of that sort. It is hardly to be supposed that appellant, a woman of intelligence and experience as she is spoken of by appel-

lee, would have entered into the contract alleged by appellee without knowledge of the probable cost to be incurred by her in carrying out the contract. She admits that she solicited appellee to undertake the sale of her tract of land, and that he agreed to do so, the undertaking being that he was to have reasonable compensation for his services if he effected a sale. She also admits authorizing a survey of the land to be made, the purpose of which was to locate certain springs, and to have the fences repaired, but denies that she agreed to any plan for the development of the property along lines suggested by appellee, and claims to have repeatedly said to him that she would not go to any expense about the sale of the land. While appellant had theretofore given appellee a check for $750 "on expense account," it appears that she did not know the nature or the amount of the expenditures he claimed to have made until he, in response to a demand made upon him by appellant's attorney in New York, rendered her, on January 10, 1909, a statement of those expenditures, amounting to the sum of $828.32, less the check of $750.

In his letter enclosing said statement of expenditures to Mr. McMahon, appellant's New York attorney, appellee writes that the expenditures had been previously authorized by appellant, with the exception of two items, or that she knew of the expenditures before she gave the check, and then again he proposes to sell the land in question on the basis of a ten *per cent.* commission. To this letter Mr. McMahon replied on January 12, 1909, denying that appellant had authorized the expenditures, and denying specifically that she had given authority for certain expenditures included in appellee's itemized statement, stating that appellant still desired to sell the property and would give him (appellee) five *per cent.* commissions if he could make a sale of it. To this letter

appellee replied on January 14, 1909, stating that he thought the division of the property into lots desirable, and had suggested it to appellant; that he had had certain surveys made and repairs to the fence done, for which she had paid him the sum of $218.61; and then, after referring to his trip to Tuxedo, ''at my own suggestion,'' and to certain photographs made by him ''on my (his) own initiative,'' he said: ''I am satisfied that Mrs. Belmont (appellant), when she recalls all that transpired in regard to the matter, must realize that whether or not she felt that she was definitely committed to carrying it on, yet she certainly had me to incur the expense for which this money was advanced, and to do the work that I have done in the matter, which, as you must realize, has been no small amount, and I feel sure that she must realize that I am entitled to a just compensation in addition to the expense, for what time, labor and thought I have expended in the matter.'' He further wrote that he felt it would be just if appellant did not care to go on with the plan that he be compensated for his work up to that time, and concludes his letter as follows: ''I believe it is to her financial advantage to do so, and hope that after having this statement from me that you will take the matter up with her and call her attention to my proposition in regard to the matter.'' To this letter Mr. McMahon replied on February 4, repeating that appellant would pay a commission of five *per cent.* on the sale of the land, but regarded all past relations with appellee at the end, etc. Thus ended the transaction between the parties and this suit followed.

It is to be observed, that as late as January 14, 1909, appellee did not know and did not claim that appellant was definitely committed to the development of her property along the lines of the tentative plan claimed to have been submitted to her by him. It is also to be observed

that throughout the correspondence related, appellee recognizes that there was no agreement on the part of appellant to make the development of her property along the lines suggested by him, and never suggests any contract, but on the contrary he is to the last urging her to go into the matter along the lines suggested by him. It is needless to cite authority for the rule of law which is in fact elementary, that a contract to be valid and enforceable must be so certain that each party may have an action upon it, and to constitute a complete contract the minds of the parties must meet in mutual agreement on every material phase constituting the alleged agreement.

In this case the complainant (appellee) under the most favorable view of the testimony given by himself or in his behalf, utterly fails to establish a contract between him and appellant sufficiently certain and complete in its terms to show that the minds of the parties met upon the essential elements necessary to make a complete agreement in a matter of this character. Not only so, but the probabilities that appellant entered into and became bound by the contract alleged in appellee's bill are clearly against him. As remarked above, it is hardly to be supposed that appellant would have agreed and bound herself to incur the expense of developing her property according to any plan that appellee might formulate or propose without being first advised as to the probable cost of such development. Appellee admits, that at the time of the alleged agreement between him and appellant there was absolutely no agreement on the part of appellant or himself as to the possible or probable costs, and he also concedes that there was no agreement on the part of appellant to spend any specific sum of money to effect a sale of the property as a whole, or in lots. Surely then, when appellant was apprised for the

first time that appellee proposed to incur an expenditure on her part of $40,000 or more in effecting a sale of the property upon a plan that he had worked out, she had a clear right to refuse to adopt the plan and incur the expense that its carrying out would involve.

The claim of appellee for services, legal and otherwise, based upon the contract alleged in his bill cannot be sustained, and, therefore, the only question for determination in this connection is, whether or not he is entitled upon a *quantum meruit* to recover anything of appellant for services in endeavoring to make sale of her land, and, if so, what amount?

Looking to a sale of her property through appellee, ''on the usual real estate basis,'' appellant admits that she authorized him to have a survey of the property made and to have the fence repaired, he having told her that it would cost $70.00 to have the survey made, and $87.50 to have the fence repaired, which amounts were afterwards paid him by check for $218.61, which included $28.61 taxes on the land for the year 1908, and the fees of the clerk of the court, $32.50, for recording the will of O. H. P. Belmont. Appellee also had a survey and map of the land made by a Mr. Richardson, but he fails to show any authority whatever for having any survey made except the one made by C. P. Jones and which was to cost $70.00, the amount paid therefor by appellant. It appears, however, that appellee procured a contract between Dr. Pole, a Mr. McClintic and appellant with respect to a water supply for their lands, which adjoined each other, the water to be obtained from a spring known as ''Thornton's spring,'' upon which an option had been secured by appellee. This contract was signed by appellant and is the only paper in the record signed by her. Appellant's version of this transaction, in effect, is that Dr. Pole told her that she could not sell her land unless

there was some definite arrangement as to water rights. To which she replied that she, Mr. McClintic and Dr. Pole, could have a definite agreement between them as to water rights and could supply the people with water. On December 7, 1908, appellant's attorney, Mr. Mc-Mahon, per letter, advised appellee that appellant realized that the development of the water situation was necessary to the sale of the land on any basis, and that she was willing to take an interest in organizing it. It appears, however, that appellee went no further with this matter than to get the contract mentioned above, and to prepare a form of a charter for the incorporation of a company to hold and control those water rights, the contract under which the said incorporation was to be formed and organized setting forth the minimum capital stock of the company, the par value of paid up stock which each of the parties was to receive for their respective interests in the water rights, and that of the capital stock five hundred dollars should be issued to appellee in consideration of his services as attorney in organizing said company, preparing charter, by-laws, and doing whatever legal work necessary in connection with its organization, etc. So that whatever compensation appellee may have earned in this connection was not because of any contract with appellant, but could only be measured by what benefits, if any, she derived from what was done by appellee under an implied authority.

Appellee claims that prior to November 13, 1908, he had seen certain persons in regard to materials, etc., and so wrote appellant from Atlantic City, but does not claim that he had seen them at the request of, or with the knowledge or authority of appellant. Appellee also claims that after writing to appellant the letter of November 13, 1908, he returned to Hot Springs and posted notices to the effect that he was authorized to announce

that appellant would open Belmont Park along lines sim-
ilar to those in force at Tuxedo Park, which announce-
ment was not only very indefinite, but it is in no way
shown by him that appellant had committed herself to
incur any expense in carrying out the plan he announced,
nor does it appear that she saw this notice before it was
posted.  Appellee then had numerous newspaper no-
tices published as news items and sent out otherwise an-
nouncement of *his* plan of development of appellant's
land into a "residential park," none of which appellant
saw before they were published or sent out.  True appel-
lee rendered not only the service authorized by appel-
lant with respect to a survey of the land, repairs to
fences, secured water rights to appellant which she con-
sidered desirable and advantageous to her property, and
also secured rights necessary to install a sewerage sys-
tem on her property, and which the proof shows added
value to the property, for which service appellee has
received no compensation.

It thus appears that while appellant wanted to sell her
property on the best terms she could and desired to
place it in appellee's hands for sale "on the usual
terms," he, not unnaturally and doubtless with com-
mendable zeal and honesty of purpose, undertook to pro-
mote a real estate scheme at the expense of appellant,
which would make a more attractive development of the
property for the community, yield a larger amount from
the sale thereof, and, as he considered, a more profitable
return to himself, but all of this undertaking was without
the authority or sanction of appellant, and to the extent
that she may have been benefited alone should she be re-
quired to compensate him.  In his letter to appellant's
New York attorney of date January 14, 1909, after all
negotiations between the parties as to a sale of the prop-
erty had been concluded, appellee makes no claim for

anything beyond a just compensation for actual services in addition to expenses.

Let us concede for the argument's sake that appellee, as he claims, secured by contract adequate water supply for appellant's property developed as he proposed; that he prepared a charter for a water company to carry out the provisions of that contract, and procured sewerage rights or privileges for appellant's benefit; that he prepared a charter of the Belmont Park association and a form of a deed of conveyance, all of which were prepared and drawn with precision and care, and after study and investigation; still it is to be borne in mind that all of this work, certainly the larger part of it was done without any authority from appellant or obligation on her part to pay for it, so that she could not be reasonably expected to pay for such part of it as she did not authorize or accept the benefit flowing therefrom to her on her property.

Appellee, while testifying in his own behalf, and after speaking of giving practically all of his time to the "Belmont matter" and saying that he had found it necessary to turn over to another attorney some matters of collection that came to his office and the institution of an important suit in West Virginia, and after further stating on cross-examination that his first interview with appellant (touching the development of her property) was on November 11, 1908, and that he stopped work thereon on December 23, 1908, was asked:

"Q. So then, as I understand you, the time actually devoted by you to the development of the Belmont property was from November 11, 1908, to December 23, 1908? A. That is correct."

As has been observed, appellee expressly states that there was no definite understanding with appellant as to the amount of his compensation by way of commission or

otherwise, and that the entire time spent by him in connection with the development of the Belmont property was from November 11 to December 23, 1908, a period of one month and two weeks. True the witnesses examined as to the value of his services, as stated in the lower court's opinion, testify to varying amounts which in their opinion appellee was entitled to receive for his services of from $500 to $5,000, but these estimates are based alone upon the assumption that the statements of appellee were borne out by the facts appearing in the record from his standpoint. One of these witnesses, a Philadelphia lawyer of experience, who fixes the value of appellee's services at $5,000, expressly states that he did not testify to what he knew to be a fact, but from testimony already given in the case; and the testimony then in the case had been introduced only in behalf of appellee. Two or more lawyers of Virginia also testify that the services of appellee were worth from $3,500 to $5,000, but their estimates are also based upon the assumed correctness of appellee's evidence as to the work he had done pursuant to authority given him by appellant. Two lawyers of New York city and one of Ohio, all of whom were experienced in the practice of the law, testified for appellant, and, assuming the correctness of appellee's testimony agree that $500 would be a reasonable and ample fee for the service actually performed by appellee between the last days of October and the 23rd day of December, 1908, when he ceased work under his alleged contract.

In the most favorable view for appellee to be taken of the evidence, we are of opinion that the allowance of $4,000 in the decree complained of, for services actually rendered or performed in his alleged efforts to effect a sale of appellant's said property, is grossly excessive, and that an allowance to him of $500 for those services would adequately compensate him therefor.

The allowance in the decree to appellee of $7,500 for damages claimed by him "for loss of what I would have gotten by reason of compensation for sales that would have been effected by me under my understanding with Mrs. Belmont," is, as we view the record, plainly erroneous. Since appellee wholly fails to prove a contract with appellant for the development and sale by him of her property, it follows that damages are not recoverable for an alleged breach thereof, no matter what appellee's understanding as to what was agreed on, or what profits he might have realized "had the contemplated development" been carried out. The essential elements necessary to make a complete agreement in a matter of this character are entirely wanting. Appellee admits that to carry out the plan of development with any hope of success along the lines he suggested would have called for an expenditure of approximately $40,000, and he also admits that at the time of the alleged agreement that there was absolutely no consideration on the part of appellant or himself of the possible or probable cost, and concedes that there was no agreement whatever on the part of appellant to spend any specified sum of money to perfect the sale of her property as a whole, or in lots. He says in his deposition: "I cannot state that anything was said in the matter of just what expenses were to be paid or would be necessary, but the development of the park necessarily required expense, and she could not have thought otherwise."

The remaining question is whether or not the lower court erred in allowing appellee to recover of appellant the balance of $78.32 alleged to be due him on account of money laid out and expended in the effort to sell appellant's property, amounting in the aggregate to the sum of $828.32, and upon which he had received the check of appellant for $750.

This account, in the larger part, was made up of charges for expenses incurred in trip of appellee to Tuxedo, for photographing the property, mapping the "Belmont Park" and publishing notices to the effect that it "was to be sold in plots laid out in a similar manner as Tuxedo Park," of all which appellant had no notice or knowledge until after she had given her check for $750 at the special request of appellee when at her home in New York, supposing, as she says, that it was asked for the purpose of meeting expenses for a survey and repairs to fences which she had authorized, and about the probating of her husband's will, as to the cost of which she was ignorant. In these circumstances it was error to decree in favor of appellee against appellant the amount of balance claimed to be due him on his alleged expense account.

For the foregoing reasons, the decree appealed from must be reversed and annulled, and this court will enter the decree which the circuit court ought to have entered, namely, that appellee recover of appellant the sum of $600, with interest thereon from April 1, 1909, till paid; but as appellant is the party substantially prevailing in this court a recovery of her costs expended in the prosecution of her appeal will be decreed against the appellee.

*Reversed.*