# Richmond

BOLLING M. MORRIS, SR., AND BOLLING M. MORRIS, JR. v.
D. P. BRAGG, TRADING UNDER THE FIRM NAME AND
STYLE OF BRAGG BROTHERS AND COMPANY.

January 15, 1931.

Present, Prentis, C. J., and Holt, Epes, Hudgins and Gregory, JJ.

*J. L. Watts* and *M. J. Fulton,* for the plaintiffs in error.

*David Meade White* and *J. C. Robertson,* for the defendant in error.

PRENTIS, C. J., delivered the opinion of the court.

This litigation arises out of these circumstances: The senior Morris owned a large farm in Surry county, which attracted the attention of those interested in colonial history, because it is called the "John Rolfe house." The witness, T. R. Goodwin, thus expresses his understanding of the facts: "It is called the John Rolfe house, but I don't think John Rolfe ever saw it. It is also called the Thomas Rolfe house and I believe he saw it (*i. e.,* the

house), but never owned it. It is my understanding it was built by a gentleman by the name of Thomas Waring (Warren) who was an intimate friend of Thomas Rolfe, who was the son of John Rolfe and Pocahontas." He says that its historical value is because of its association with John Rolfe, due to the fact that the land on which the house stands was left to Thomas Rolfe by his father, "and Thomas Waring (Warren) built this house on it without, I believe, getting a deed to the land, but Thomas Rolfe knew he was building the house, and he was an intimate friend of Thomas Waring (Warren)."

In "Old Surry," A. W. Bohannan, published 1927 by Plummer Printing Company, Inc., Petersburg, Virginia, pages 18–20, it is stated that there is evidence in the records of Surry county indicating that the land once belonged to Powhatan, the father of Pocahontas, who married John Rolfe; and also that "this much, however, is settled beyond a doubt, the land here was a gift from the Indian king, Powhatan, and Thomas Rolfe once owned it."

This proceeding by motion is based upon a written contract under seal, which authorized Bragg, who was a real estate agent, to procure a purchaser for the land, and provided for the payment of ten per cent commission to Bragg, in consideration of his efforts to find a purchaser. The pertinent provisions of the contract are quoted in the opinion of the trial judge, hereafter reproduced.

■ There are many errors assigned, and many cases cited in which compensation to real estate agents has been allowed or denied, but few of them are helpful in this case because its solution depends upon the precise terms of the specific, though unusual, contract between the parties.

Bragg, the plaintiff, is a colored real estate agent (and the owner, Morris, is also colored). Bragg deemed it advisable to secure and did secure the aid of a prominent real estate agency in Richmond (Pollard and Bagby, Inc.).

A cut of the Rolfe house located on the property was made and published along with advertisements in a Richmond newspaper. These advertisements directed attention to the value of the house as a colonial monument. It had attracted the attention of persons interested in such properties before this contract had been entered into, and Mrs. John B. Lightfoot, representing the association for the Preservation of Virginia Antiquities, had made an offer for it. After the contract had been entered into, the real estate agents, in the name of Mrs. Lightfoot, approached the owners again, acting under the provisions of the contract, but the price offered was unsatisfactory to the owners. Then, in May, 1928, Mr. T. R. Goodwin, the son of Dr. W. A. R. Goodwin, of Williamsburg, visited the owners on the place. Dr. Goodwin's interest was based upon the same considerations which had also enlisted the interest of Mrs. Lightfoot. He is the agent of the corporation known as Colonial Williamsburg, Incorporated, organized for the purpose of restoring and preserving colonial buildings in and about Williamsburg, Virginia, made possible only by the princely munificence of that philanthropist of broad vision, that patriot with the generous heart and open hand, John D. Rockefeller, Jr.

T. R. Goodwin, as the result of a long conference with Bolling M. Morris, Sr., finally secured a written option on twenty acres of the property upon which the house stands for $9,000, which he testifies was made in the name of Mrs. Lightfoot, as president of the A. P. V. A. This because the owners knew something about Mrs. Lightfoot and did not know Goodwin. As the result of this option, Dr. Goodwin secured a deed for this portion of the estate, paying therefor $9,000. That this was with the acquiescence of Mrs. Lightfoot is apparent from the testimony of Goodwin.

Bragg sued for and recovered $900, ten per cent upon

the gross purchase price, and to this judgment a writ of error has been allowed.

As has been indicated, we do not think it necessary to review the Virginia cases referring to contracts which have no similarity to the contract which is here to be construed. A few cases have been cited from other jurisdictions which tend to support the trial judge's conclusion, as expressed in his instructions to the jury as well as in his opinion.

Among these cases is *Owens* v. *Wehrle,* 14 Pa. Super. Ct. 536. There Wehrle, by written contract, placed his property in the hands of the agent for the period of twelve months, followed by this provision: "And do empower the said George T. Owens to act as my agent in the sale of the same; and in case a sale is effected through the above agent, or any other person, or within the time specified, I agree to pay the said George T. Owens commission of five per cent on the full amount of sale, and to pay the same out of the first money received by me." The court held that the construction of the written agreement was for the court, and denied the contention of the defendant that the meaning of the contract should be held to be that the agent was to be paid provided he effected a sale; that failing to show this it was not sufficient to show that it was effected by some other person. As to this the court said: "We have before us a written agreement, which is not ambiguous in its terms, which is not susceptible of more than one meaning, namely, that should the defendant's property be sold during the time limited, by the plaintiff or by anyone else, the plaintiff should receive a certain sum of money, measured by a per centum of the price received. If it be said that the contract, thus read, bears hardly on the defendant, the reply is that the courts do not sit to relieve suitors from the results of improvident agreements, nor the consequences of bad bargains. It may be that the defendant made a foolish agreement. It may be also that the

plaintiff, in the mind of the defendant, at least, was worth as agent the provision made for him. At all events, the provision was made, and while it would seem, in the absence of proof that the plaintiff made efforts to sell the property, that consideration was wanting, yet is the suggestion met by the presence of a seal to the agreement importing consideration. *Geiselbrecht* v. *Geiselbrecht,* 8 Pa. Super. Ct. 183.

"This, as has been seen, is not the mere appointment of an agent. It is not merely the entry of a property with a real estate broker for sale on commission. It is a formal agreement under seal, whose terms we are asked to enforce. We are of the opinion that the court below could not have done otherwise than direct a verdict for the plaintiff upon the case as it was presented before him."

In *Kimmell* v. *Skelly,* 130 Cal. 555, 62 Pac. 1067, the contract provided: "For and in consideration of the services to be performed by Messrs. Hooker and Lent, I hereby employ them as my sole and exclusive agents to sell for me that certain real property * * *. This employment and authority shall continue for the full period of thirty days from the date hereof and thereafter until withdrawn by me in writing; and I agree to pay to said Hooker and Lent, in the event of the sale of said real property by them or by anyone else, including myself, while this contract is in force, two thousand two hundred and fifty dollars as and for their compensation." In that case the owner, after the expiration of thirty days but before any withdrawal, sold the property to a purchaser who was not found by the real estate brokers. They were allowed to recover the amount specified in the contract just quoted. In holding that the contract there was not the ordinary broker's contract, but specifically quite different therefrom, and made by persons competent to contract, the court held that there was a sufficient consideration for the contract supplied by the efforts of the brokers, and concluded thus: "The ques-

tion here presented is purely one of construction of this particular contract, and it is immaterial what may be the judicial construction given the ordinary broker's contract. The brokers here did not agree to find a purchaser, but being employed to find one, they were agents of defendant to that end, and were legally bound to use their time and labor for the benefit of their principal; and it is the use of this time and labor which forms the consideration to support her promise to pay them the compensation mentioned in the agreement."

Another case involving a contract somewhat like that here involved, in which a recovery was allowed, is *Goward* v. *Waters*, 98 Mass. 596. There the owner fixed the price of his property, and agreed to pay the agents any amount which they might secure for the property in excess of that price, and then promised that in case he, the owner, should sell it at the fixed price, or at a greater or less price, then that he would pay the agents three per cent of the amount paid him for the property. The defense there was that there was no consideration for the unusual promise to pay even though the owner sold the property himself, but the court overruled this contention and permitted the recovery, holding that the contract contemplated services to be rendered and that the promise was a valid one, made in view of such future services and expenses incurred by the agents.

While none of these contracts is precisely like this one, these cases state the principle applicable thereto. Here, the pertinent language in the contract is that in consideration of the efforts of the brokers to find a purchaser, it was agreed to pay commissions in case sale was made to any persons to whom the agents presented the property, and that they should likewise have the stated commission should a sale or exchange of the property be made either by the agent or by any other person or persons. While

we do not know whether the sale was actually made to Dr. Goodwin as a consequence of the advertisement, or through Mrs. Lightfoot, an intermediary, and as a consequence of its presentation by the brokers to her, there is nevertheless good reason for supposing that either or both may have influenced the sale, and there is nothing upon which to base a conclusion that the brokers were not thus directly or indirectly the procuring cause of the ultimate sale; and even though neither of these suggestions be true, the result would be the same under this contract.

If what we have said is insufficient, we reproduce the opinion of the trial judge, the Honorable Frank T. Sutton, Jr., as stating reasons amply sufficient for affirming the judgment:

"This is a proceeding by notice of motion for a judgment for $900.00, with interest from May 5, 1928, alleged to be due as commissions under a contract for services concerning sale of real estate in Surry county.

"Due to the fact that the writing evidencing the terms of the agreement contained unusual terms, the usual principles governing the recovery of commissions by agents for the sale of property are not applicable, and the case must be controlled by the terms the parties agreed upon.

"By writing under their hands and seal, dated the 4th day of May, 1926, the defendants, among other things, authorized the plaintiff to sell certain property in Surry county. The particular clause of this writing which governs the issue raised in this case reads as follows:

" 'In consideration of your efforts to find a purchaser for the above described property, it is hereby agreed, should a contract of sale or exchange acceptable to the undersigned be made by you to any person, firm or corporation within or during the life of this contract to whom you have presented said property; or should a sale or exchange of said property be made in any other manner, through or by you

or any other person or persons, then a commission of ten per cent of said sale becomes payable to you on demand.'

"By. another of the terms of the writing the contract was to remain in force for three years from the 4th day of May, 1926.

"Few, if any, of the material facts in this case are controverted. Such as were controverted raised questions for the jury. Their verdict resolved these facts (so far as necessary to determine the vital issue) in favor of the plaintiff. The execution of the written contract of May 4, 1926, is not denied. It is under seal. This imports a consideration for the promise of the defendants on its face and the writing is not merely a unilateral promise.

"It is not necessary, however, under the facts of this case, to rely upon the above rule. The writing of May 4, 1926, may be treated as a mere offering open for acceptance during the time limit therein specified unless revoked before acceptance.

"In Williston on Contracts, at page 12, the rule touching such a situation is stated as follows: 'An offer of reward, an offer of a price for goods, or for services, becomes a contract when what is requested is given or done, although no obligation to give or do anything ever existed.'

"Again, the same author says, at page 30: 'An offer is to be known from other conditional promises only because the performance of the conditions in an offer is requested as exchange or return for the promise in the offer, thereby giving the offeree *a power* by compliance with the request to turn the promise in the offer into a contract or sale.' (Italics supplied.)

"The evidence shows that the promisee did make efforts to find a purchaser for the property. The doing of such acts was an acceptance of the offer and forms in law

a valid consideration for the promise to pay ten per cent commissions, etc. From the time said efforts to make sale were performed the writing of May 4, 1926, was no longer a *nudum pactum*. Unless the offer had been revoked before such acceptance by the efforts of the promisee to make sale it became a binding contract. There is no dispute in the evidence about the fact that it had not at any time been expressly revoked by the defendants, nor had it expired by the time limit prescribed in the writing.

"It is urged by the defendants that the sale was made by the owner direct, and that the owner was not within the class contemplated by the words, 'or should a sale or exchange of said property be made in any other manner, through or by you or any other person or persons, then a commission of ten per cent of said sale becomes payable to you on demand.'

"T. R. Goodwin, a witness introduced by the defendants, said that he was the son of W. A. R. Goodwin, the latter representing Colonial Williamsburg, Incorporated; that he went from Williamsburg, Va., to Surry county and spent about six hours negotiating with the defendants for a sale of a portion of the property. He said that he was paid no commission by the defendants and was not employed by them. This witness said he represented his father (W. A. R. Goodwin) and the interest that his father represented.

"Thus it appears that the sale was made through the efforts of a third party. The vendor and vendee were brought together by the efforts of a third party. Though this third party represented the purchaser, that is not an unknown occurrence in real estate circles.

"According to T. R. Goodwin, it was his persistence, extending over a period of over six hours of negotiation, that resulted in his obtaining an option for which he paid $25.00, which option was in the name of Mrs. John B. Lightfoot, of Richmond, Virginia.

."Another phase of this case is worthy of consideration. There was testimony that the plaintiff had, on a previous occasion, carried the defendants an offer from Mrs. John B. Lightfoot, of Richmond, to purchase this property. The witness, Goodwin, said that the defendants were unwilling to give an option to anyone but Mrs. Lightfoot, and further said it was through Mrs. Lightfoot's acquiescence (express, implied, or taken for granted, it does not clearly appear) that the conveyance was finally made to W. A. R. Goodwin. W. A. R. Goodwin, as evidence shows, was acting for Colonial Williamsburg, Incorporated.

"For convenience, the following extract from the writing of May 4, 1926, is again quoted: 'Should a contract of sale or exchange acceptable to the undersigned be made by you to any person, firm or corporation within or during the life of this contract *to whom you have presented the property;* * * *.' (Italics supplied.)

"The act of the plaintiff in obtaining from Mrs. Lightfoot a *written* offer to purchase said property made her one to whom the plaintiff had 'presented the property.'

"Nine instructions requested by the defendants were refused. Some of them contained incorrect statements of the law of the case, and the others, while stating correct propositions of law, were wholly inapplicable under the evidence of this case. They were, therefore, useless, and would have been confusing to the jury.

"For the reasons stated above, this case is easily distinguished from the case of *Perrow* v. *Rixey*, 119 Va. 192, 89 S. E. 101. In that case the court very tersely said: 'The paper upon its face is unilateral not under seal * *.' In the case at bar the paper was under seal. Continuing, the court said in that case: 'And does not express that it was made upon a valuable consideration.' In the case at bar, the defendants, in writing, made a promise, under seal, in consideration of the plaintiff making efforts to sell.

Taking this as a mere offer on the part of the defendants, and applying well settled principles, it became binding when the plaintiff made the designated efforts before a revocation of the offer was made.

"*Belmont* v. *McAllister*, 116 Va. 285, 81 S. E. 81, was relied on by the defendants. In this case there was a lack of mutuality which prevented the formation of a binding agreement. But in the case at bar, when the plaintiff supplied the 'efforts' which the defendants expressly made a consideration for their promise to pay commissions, the legal requirement of mutuality was present.

"The case at bar is rather controlled by the principles so clearly stated in *A. C. Realty Co.* v. *Townsend*, 124 Va. 490, 98 S. E. 684, where *Perrow* v. *Rixey, supra*, is distinguished and explained. At the bottom of page 507 of 124 Va., 98 S. E. 684, the court, quoting from Mechem on Agency, says: 'But as has already been seen, there may easily be cases in which the principal has so invited the broker to enter upon an undertaking requiring time for its full completion, that the actual commencement of the performance with the intention of completing it would be such an acceptance as would prevent the principal's withdrawal without liability.'

"This expression covers the case at bar. The writing of May 4, 1926, definitely promises the plaintiff a commission of ten per cent for the plaintiff's efforts to find a purchaser. The only condition was that a sale should be made by someone (it mattered not who) within the time limit set by the writing. This invited the plaintiff to enter upon an undertaking to find a purchaser. Such an undertaking required time, but the plaintiff actually commenced the work by bringing to the defendants an offer from Mrs. Lightfoot. This act of the plaintiff, if *bona fide*, was an acceptance. The jury were told by instruction that the efforts must be *bona fide*.

"The court is of the opinion that the motion to set aside the verdict should be overruled and judgment entered in accordance with the verdict of the jury."

*Affirmed.*

Epes, J., dissenting:

The contract here in question is embraced in a letter signed by Bolling M. Morris, Sr., and Bolling M. Morris, Jr., addressed to Bragg Brothers and Company, agents. The material parts of this letter read as follows:

"Gentlemen:

"I hereby agree to sell and authorize you to procure a purchaser for the following property" * *.

"In consideration of your efforts to find a purchaser for the above described property it is hereby agreed, should a contract of sale or exchange acceptable to the undersigned be made by you to any person, firm or corporation, or during the life of this contract, to whom you have presented said property; or should a sale or exchange of said property be made in any other manner, *through or by you or any other person*, then a commission of ten per cent of said sale shall become payable to you on demand.

"This contract * * * to remain in force for a period of three years from the 4th day of May, 1926, and to continue after the above specified term of three years in full force and effect until said property is sold, or this contract is terminated by a ninety days written notice given after the above specified time by the undersigned withdrawing the sale of said property." (Italics mine.)

I do not concur with the opinion expressed by the court as to the correct construction of this contract.

The opinion of the court takes the view that the words "through or by you or any other person or persons," as a matter of law means, and can only mean, "through or by you or any other person or persons, *including ourselves.*"

I am of opinion that the language is susceptible of two constructions, that is, the words "any other person or persons" may mean any person other than you (Bragg), or it may mean any person other than the parties to this agreement; and that when the contract is read in conjunction with the other terms thereof, and in the light of the general purpose of the contract and the surrounding circumstances, it is more reasonable to infer an intention of the parties to give it the latter construction than the former.

The contention of Bragg that he is here entitled to exact his pound of flesh must rest solely upon the particular language here in question. It has nothing else to support the exaction.

There is no other language or provision in the contract which either requires or indicates that the former meaning should be given to these words; and there are no extrinsic facts or circumstances proven which prove or warrant the inference that there was any meeting of the minds of the parties upon an agreement that if the Morrises made a sale of this property themselves, they would pay Bragg a commission of ten per cent.

"In accordance with the weight of reason and authority it is generally held that a broker has neither an exclusive right, nor an exclusive agency, to sell, even though he is employed for a definite period of time, unless he is granted either one or the other in unequivocal terms to that effect." 4 R. C. L., page 259, section 12.

On the contrary, the rather meager efforts which the record shows were put forth by Bragg to sell this property are much more in accord with an original interpretation on his part of this contract as an ordinary real estate agent's contract for the sale of land, than of a contract to pay him ten per cent on any sale that might be made of the property, even by the owners themselves, in consideration

of his making an effort to sell it. If such was Bragg's interpretation of the contract, he has rendered just about the minimum amount of service which he could have rendered and yet plead good faith in the performance of the contract, or even the doing of sufficient to amount to an acceptance and prevent said letter from being merely an unaccepted offer.

The uncontradicted evidence is that Bragg drafted this letter in *toto* and presented it to the Morrises for their signature as a completed instrument, and that neither did the Morrises have anything to do with the preparation of the letter nor was it drafted to accord with any prior agreement of, or suggestion by, the Morrises. Under the well recognized rule of construction, the language is to be considered to be as it is, the language of Bragg, and is to be construed most strongly against him. When so construed it seems to me that there can be no doubt but that the second construction is the correct construction of the language in question.

The cases cited in the opinion of the court are easily distinguished from the case at bar. In each case the contract in question contained specific language very clearly including a sale made by the owner himself, and the language used in the opinions must be read in the light of that fact.

In *Kimmell* v. *Skelly*, 130 Cal. 555, 62 Pac. 1067, the language of the agreement was: "I agree to pay to said Hooker and Lent, in the event of the sale of said real property by them or anyone else, *including myself*, while this contract is in force, $2,250 as and for their compensation." (Italics mine.) The term of the contract in this case was thirty days.

In *Goward* v. *Waters*, 98 Mass. 596, the contract provided: "In case *I myself sell* said premises at said price of $4,500, or at a greater or less price, then I further agree to pay

said Zehphaneah and Frances Goward three per cent of such price paid to me for said premises." (Italics mine.) In this case no specified time for which the contract was to run was stated.

In *Owens* v. *Wehrle*, 14 Pa. Super Ct. 536, the language of the contract was: "In case a sale is effected through the above agent, or any other person, *or within the time specified*, I agree to pay the said George T. Owens commissions of five per cent on the full amount of sale." (Italics mine.) The term of the contract in this case was twelve months.

No language corresponding to the italicized parts of the contracts involved in said three cases is to be found in the contract here in issue.

Bragg also contends (1) that this sale was, within the meaning of said contract, made by or through a person other than either Bragg or the owners of the property; and (2) that the property was sold to a person presented to said property by Bragg. I understand the opinion of the court to sustain both of these contentions. I am of opinion that they are both even less tenable than the contention that under this contract the Morrises had obligated themselves to pay Bragg a commission on any sale made by the Morrises themselves of this property to some person of whom Bragg had never heard.

If the correct construction of this contract be, as I think it is, that the Morrises were not obligated thereby to pay Bragg a commission on a sale made by them of the property to some person of whom Bragg had never heard, then it seems to me to be unquestionable that the language, "should a sale or exchange * * be made in any other manner through or by you or any other person," comprehends only a sale made by or through Bragg or by or through some other person acting for or on behalf of the Morrises, *i. e.*, a person in some sense at least the agent of the Morrises.

Suppose the president of Colonial Williamsburg, Incorporated, had come to the Morrises and procured a contract

of sale from them. In a sense the sale would have been made by or through him, for a corporation can act in such cases only through its agents, but I think no one would hold that in such a case the sale was made by or through some person other than Bragg or the Morrises within the meaning of that contract. I can see no difference when Dr. Goodwin, who was in fact acting for Colonial Williamsburg, Incorporated, sent his son as his agent to procure the contract.

The contention that the Morrises sold this property to a person to whom it had been presented by Bragg is based upon the fact that young Mr. Goodwin took the option he procured in the name of Mrs. Lightfoot, with whom Bragg, or his representative, had had some negotiations with reference to this property.

The evidence on this point is the testimony of Mr. T. R. Goodwin who procured the option from the Morrises. Omitting certain questions and answers which are not material, his testimony is as follows:

Direct examination by counsel for the Morrises:

"Q. What relation are you to W. A. R. Goodwin?

"A. I am his son, sir.

"Q. Did you purchase for W. A. R. Goodwin the twenty acres of land referred to in the deed dated June 26, 1928, which I hand to you now and ask you to look at and see if you purchased that?

"A. I secured the option on the property mentioned here for W. A. R. Goodwin and the interests which he represents.

"Q. Did you secure that option directly from Bolling Morris, Sr., one of the defendants here?

"A. Yes, sir.

"Q. Who did you represent in that transaction?

"A. I represented my father, Dr. W. A. R. Goodwin, and the interests that he represents.

"Q. Were you paid any commission or employed in any way by the defendants, Bolling M. Morris, Sr., and Bolling M. Morris, Jr., to effect that sale?

"A. No, sir.

"Q. Did you approach them or did they approach you?

"A. I approached them, sir.

"Q. The consideration was $9,000.

"A. Yes, sir.

"Q. Did the plaintiffs here, Bragg Brothers or Dr. D. B. Bragg, have anything to do with your purchase of that property?

"A. Nothing whatever, sir.

"Q. You didn't know them in the transaction at all?

"A. I never heard of them until I was summoned in this case.

### Cross Examination

"Q. Mr. Goodwin, you told the jury that you represented your father and the interests that your father represented. Whom does your father represent?

"A. He represents and I believe is a member of the corporation Colonial Williamsburg, Incorporated, which is a corporation—a non-profit making corporation—which seeks to preserve the Colonial homes in and about Williamsburg.

"Q. Where did you go to obtain this option that you speak of?

"A. I went to what is known as the Rolfe house in Surry county.

"Q. Did you know who owned it at the time?

"A. I had heard, yes, sir.

"Q. Who gave you that information?

"A. Well, we had heard of the dealings that had been going on. I think the A. P. V. A. had tried to purchase the property at one time or another.

"Q. You said the A. P. V. A. What is the A. P. V. A.?

"A. The Association for the Preservation of Virginia Antiquities.

"Q. They had been trying to acquire it?

"A. So we understood, yes, sir.

"Q. From whom did you understand that?

"A. From the owner of the property who was said to be Bolling M. Morris.

"Q. Bolling M. Morris told you that one of these historical organizations had been trying to buy it?

"A. He had told me so, but I knew it before I went there.

"Q. And he confirmed it?

"A. Yes, sir.

"Q. What did he ask you when you first spoke to him about it?

"A. $10,000.

"Q. How did you happen to agree on $9,000?

"A. Well, I think there was something like six hours of talking involved. It would be rather difficult to explain at just what point we agreed on it.

"Q. Did you take this option in your own name?

"A. No, sir; I didn't.

"Q. I don't think it would be wrong, but whose name did you take the option in?

"A. It was taken, if I remember correctly, in the name of Mrs. Lightfoot, of the A. P. V. A., for the reason that Bolling M. Morris did not know me and did not care to make out an option to me.

"Q. Did he tell you that Mr. Bragg had submitted previously to him an offer from that same woman?

"A. He told me nothing about Mr. Bragg. I never heard the name before.

"Q. When did he tell you he had learned of Mrs. Lightfoot?

"A. He told me Mrs. Lightfoot had stopped by on many occasions to see him, which I believe she has.

"Q.   So you took the option in the name of Mrs. John B. Lightfoot?   I mean Mrs. Lightfoot, of Richmond?

"A.   Mrs. Lightfoot, the president of the A. P. V. A.

"Q.   Now was that option afterwards—the rights under it—exercised by you?

"A.   At the time the deed was made the deed was made I believe to my father and not to Mrs. Lightfoot.

"Q.   Did Mrs. Lightfoot assign her right under the option to your father?

"A.   It was not necessary.   She would have if it had been necessary, I am quite sure.

"Q.   But the option was to Mrs. Lightfoot and not to anybody else?

"A.   Mrs. Lightfoot, president of the A. P. V. A.

"Q.   And the deed was made to your father?

"A.   W. A. R. Goodwin.

"Q.   Under that option?

"A.   Yes, sir.

"Q.   Was Mrs. Lightfoot consulted at all about it?

"A.   Yes, sir.

"Q.   She agreed that your father should take the deed?

"A.   I believe Mrs. Lightfoot was heartily in favor of anyone who wished to preserve the home buying it.

"Q.   You never knew this man Bolling until you went to see him?

"A.   Not until I met him in the cornfield.

"Q.   As a matter of fact, you really made the sale?   You went over there to see this man and got the option which was afterwards exercised—the rights under the option?

"A.   I made the sale?   I don't quite understand you.

"Q.   Didn't you go over there to see this man Bolling?

"A.   Yes, sir.

"Q.   Didn't you get an option from him?

"A.   I got an option from him.

"Q. That was the purpose of your going over there?

"A. Yes, sir.

"Q. Then afterwards that option was exercised?

"A. Yes, sir.

"Q. And the deed was a result of that?

"A. Yes, sir.

"Q. So you made the sale, didn't you?

"A. Made the sale?

"Q. Yes.

"A. I wouldn't say so. I think I made the purchase.

"Q. That is what I mean. You made the purchase. It wasn't conveyed to you?

"A. No. I mean I made the preliminary negotiations for the purchase.

"Q. You obtained the option?

"A. Yes, sir.

"Q. Which was afterwards exercised?

"A. Yes, sir."

I think that this is insufficient to warrant the inference that this option was ever taken for anyone except Dr. Goodwin, or Colonial Williamsburg, Incorporated. It is true it was taken in Mrs. Lightfoot's name, and doubtless true that if necessary to secure to Dr. Goodwin a sale of the property she would have adopted the unauthorized act of this young man, and have exercised it for the beneficial interest of Dr. Goodwin, or Colonial Williamsburg, Incorporated; but the evidence wholly fails to show that she did so.

In order to get these negroes to sign an option, Dr. Goodwin took it in the name of a person other than the person for whom it was in fact taken. The fact that the real person for whom the option was taken was thus concealed from them should not be permitted to prejudice their rights here. They are entitled to rely on the real facts, even though they were concealed from them.

Even granted that this property was presented to Mrs. Lightfoot by Bragg or his representative, she neither bought it nor took an option thereon. Neither Bragg nor any one else ever sold it to her.

It does not affirmatively appear that Mrs. Lightfoot brought this property to the attention of Dr. Goodwin; but even if she did, it did not make Dr. Goodwin a person to whom Bragg had presented the property.

I do not understand the law to be that if a real estate agent present property to A. who makes an offer for it which is not accepted, and than at some later time A. calls B.'s attention to the property and B. purchases it, that the real estate agent can claim to have presented or sold it to B.

In my opinion the judgment of the court should be reversed and final judgment here entered for the plaintiff in error.