## 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

### TOWN OF STRASBURG V. CHANDLER.

#### November 14, 1918.

1. MUNICIPAL CORPORATIONS — *Boundaries* — *Maps.* — Acts 1855-6, page 180, provided that the town of Strasburg "as the same has heretofore been laid off in lots, streets and alleys, and as the same shall be hereafter laid off into lots, streets and alleys," should be a town corporate. The evidence tended to show, and the circuit court found, that the limits of the town intended to be designated in the act by the words, "as the same has heretofore been laid off into lots, streets and alleys," were fixed by an old map made in 1847. The evidence as to this old map was not altogether satisfactory, but it showed the boundaries of the town "laid off into lots, streets and alleys" as the same had apparently been very generally recognized by the inhabitants, and, in the absence of proof to the contrary, might very reasonably and properly be regarded as fixing, by a preponderance of evidence, the location contemplated by the act of incorporation.

2. MUNICIPAL CORPORATIONS — *Boundaries—Maps.* — Acts 1883-4, page 739, provided that the town of Strasburg as heretofore laid off and as may hereafter be extended, shall continue to be a body politic. Shortly before the passage of this act a survey had been made of the town, known as the McInturff survey, including a larger territory than that shown by the old map of 1847. The map of 1847 showed the town laid off in "lots, streets and alleys" and embraced no unplatted land, while the McInturff survey included some land not platted.

   *Held:* That a preponderance of the evidence supported by the wording of the act showed that the act of 1884 had reference to the McInturff survey and not to the old map of 1847, especially as the town officials and the parties to the suit had acted as though the lines of this survey had been generally accepted as the town limits.

3. MUNICIPAL CORPORATIONS—*Survey—Code 1904, Section 1014.*— Code 1904, section 1014, and similar provisons in the statutes since 1845, direct the council of every city and town to make a survey and plan thereof, showing the lots, streets and alleys therein, the same to be recorded in the proper clerk's office and in the record books of the municipality, and to be evidence of the boundaries of said lots, streets and alleys.

   *Held:* That these statutes have no pertinence to a suit to recover taxes paid and to enjoin further taxes by property owners, who alleged that their property was not within a town where the disputed territory had not been platted at all when the act incorporating the town was passed, nor until sometime thereafter.

4. MUNICIPAL CORPORATIONS—*Survey—Code 1904, Section 1014— Directory.*—Section 1014, Code 1904, and similar acts are directory only; and, moreover, the evidence of boundary, even as to lots, streets and alleys, as provided for in the statute, is not exclusive of any other satisfactory method of proof.

5. MUNICIPAL CORPORATIONS—*Annexation of Territory.*—Acts of 1883-4, page 739 provided that the town of Strasburg as heretofore laid off and as may hereafter be extended, shall continue to be a body politic, although the act did not in express terms declare a purpose to annex new territory, this was not necessary, provided the act used, as it did, language sufficient to embrace and definitely locate territory outside of the former limits of the town.

6. MUNICIPAL CORPORATIONS—*Annexation—Power of Legislature.*— Under the law as it stood in this State in 1884, it was competent for the legislature to annex new territory, and to determine for itself the justice and expediency of the change, regardless of any consent or expression of opinion by the owners of the territory affected thereby. There were no constitutional provisions to the contrary, and in the absence of such provision, this is the law everywhere.

Appeal from a decree of the Circuit Court of Shenandoah county. Decree for complainants. Defendant appeals.

*Reversed.*

The opinion states the case.

*Tavenner & Bauserman,* for the appellant.

*C. B. Guyer, for the appellees.*

KELLY, J., delivered the opinion of the court.

This suit was brought by F. H. Chandler and P. N. Jarrett to enjoin the town of Strasburg from collecting certain municipal taxes on real estate owned by them and alleged to be situate outside of the territorial limits of the town, and to recover certain similar taxes theretofore paid by them. The decree complained of denied a recovery for the taxes already paid, but held that the property was not within the corporate boundaries, and accordingly awarded a perpetual injunction against the future enforcement of such taxes.

Strasburg is a very old town, and its existence is recognized in a number of acts of the General Assembly, but in the determination of its boundary lines only two of these acts are material. The first is the act of February, 1856 (Acts 1855-6, page 180), which, so far as material here, is as follows:

"Section 1. Be it enacted by the General Assembly, that the town of Strasburg, in the county of Shenandoah, *as the same has heretofore been laid off into lots, streets and alleys,* and as the same shall be hereafter laid off into lots, streets and alleys, shall be and the same is hereby made a town corporate by the name of the town of Strasburg." (Italics added.)

[1] The evidence tended to show, and the circuit court found, that the limits of the town intended to be designated in the act by the words, "as the same has heretofore been laid off into lots, streets and alleys," were fixed by an old map

made in 1847, a tracing of which was produced by the town and relied upon by it to show the territory embraced within the municipality from 1856 until the charter was amended by the act of 1884, to which we shall presently advert. In this finding we concur. The evidence as to this old map is not altogether satisfactory, but it shows the boundaries of the town *"laid off into lots, streets and alleys"* as the same had apparently been very generally recognized by the inhabitants, and, in the absence of proof to the contrary, may very reasonably and properly be regarded as fixing, by a preponderance of evidence, the location contemplated by the act of incorporation. And, although the complainants alleged in their bill that it was imposible to locate any definite limits for the town under any of the acts recognizing its existence, and apparently challenged the validity of its charter on this ground, we do not understand that they are now insisting upon the latter position nor questioning the correctness of the map of 1847 and its sufficiency in establishing the boundaries intended to be recognized by the act of 1856. The boundaries as thus established do not embrace the property of the complainants.

This brings us to the consideration of an act of March 19, 1884 (Acts 1883-4, page 739), amending or changing the charter of Strasburg, and, according to the contention of its counsel, so extending the limits of the town as to include the property in question. That act, so far as it need be here set out, reads as follows:

"1. The town of Strasburg, in the county of Shenandoah, *as heretofore laid off* and as may hereafter be extended, shall continue to be a body politic under the name of the corporation of Strasburg, etc." (Italics added.)

It is clear from the record before us that the words "as heretofore laid off," in the act of 1884, must refer either to the corporate limits as established by the act of 1856 and evidenced by the old map of 1847, thus excluding the com-

plainants' property, or to an enlarged territory embraced in a survey made shortly before the act of 1884 was passed, known in this cause as the McInturff survey, and including the property of complainants. The trial court was of opinion and decided that this act made no change of territory and had reference to the lines on the map of 1847, and that, therefore, the complainants' property was not subject to municipal taxation. This is the final and decisive question in the case, and it is not altogether easy of solution. We feel constrained, however, upon a careful consideration of all the facts and circumstances, to construe the act of 1884 as having reference to the corporate limits as "laid off" by the McInturff survey. This result follows from the same process of reasoning which leads us to connect the act of 1856 with the map of 1847. Let us see if this is not logical. In finding, as did also the lower court, that the lines of the map of 1847 were referred to by the act of 1856, we necessarily have to resort to extrinsic and parol testimony. Nothing in the act itself refers to any map or survey or throws any light upon the question, except the words, "as the same has heretofore been laid off into lots, streets and alleys." Counsel for the town discovered and produced a map or description showing a plan as "laid off into lots, streets and alleys." This was the map of 1847, which, according to the best testimony obtainable after the lapse of so many years, showed corporate boundary lines as generally recognized in the community. The court, therefore, notwithstanding the further fact that the map does not appear to have been made by any official authority, must, in the absence of more definite proof, accept those lines as correct. We must do this because we must give some meaning to the act of 1856 if we can, and we can only do so by finding some local description with which to connect it.

[2] When we come to construe the act of 1884 we are confronted with a very similar situation. Nothing in the act

itself directly refers to any map or survey or throws any light upon the question, except the words "as heretofore laid off." There is no reference to the act of 1856 and we cannot say, from the language used, that the new act means to incorporate the identical territory embraced in the old one. Upon the contrary, the language of the new act in this respect is so different from that of the old one that the difference seems significant, especially in the light of the extrinsic evidence. The act of 1856 incorporated the town "as the same has heretofore been laid off into lots, streets and alleys," and the map of 1847 showed a plat of the town made up exclusively of "lots, streets and alleys," and embracing no unplatted land. The act of 1884, on the other hand, incorporated the town "as heretofore laid off," without limiting it to "lots, streets and alleys;" and the McInturff survey, which we think was run upon the lines as contemplated in the latter act, embraced, not only the lots, streets and alleys shown on the map of 1847, but also some unplatted land, a part of which was subsequently subdivided and sold to complainants and others.

Both acts apparently intended to provide for future enlargements of territory by the action of the municipality itself. Without passing upon the validity and efficiency of this feature of the enactment, it is worthy of note that the words, "as the same shall hereafter be laid off into lots, streets and alleys," in the act of 1856, appear to emphasize the restriction of the area incorporated to land actually subdivided as town property, while the words "as may hereafter be extended," in the act of 1884, appear to emphasize the elimination of any such restriction.

Upon some points, the parol testimony is conflicting, but viewing all the evidence, direct and circumstantial, as a whole, we think the preponderance of it shows that the McInturff survey was made in the early '80's prior to the passage of the act of 1884; that this survey was made at

the instance of the town council and in contemplation of an amendment of the charter; that it was entered upon the records of the town, and the records afterwards lost or destroyed; and that, while the primary purpose of the amended charter was, not to enlarge or fix the boundaries, but to give the town better control of the liquor traffic, the survey was nevertheless an authentic and official "laying off" of the town, intended to be used in connection with the proposed new charter and most probably in the mind of the draftsman who prepared the act of 1884. It is clearly shown that the Rev. J. B. McInturff who made the survey also drafted the new charter, and while it is true that he was unable to testify definitely as to the date of his survey, and could not, from his personal recollection, connect the survey and the preparation of the charter, he believed, and gave good reasons for the belief, that the two were directly connected. He was clear and positive in his recollection and testimony that he made the survey and drew the charter on behalf of the town council, and that the principal purpose of the survey was to enlarge the corporate limits. As to the exact date of the survey, and whether before or after the new charter, he would not undertake to claim a recollection, but he made the following statement, which, in view of the residue of his testimony, and his manifest impartiality and truthfulness as gathered from the whole of his deposition, we think is entitled to very great weight: "I cannot say I have a recollection—it is rather an inference again. The impression comes that the two went together, without a recollection about it, as we were enlarging the corporate limits and endeavoring to get the approval of the legislature; that they went hand in hand generally. That was the reason I infer. I had no reason to charge my memory with the question that comes up now. I have no record, and, as Mr. Tavenner said, I was a busy man and had many duties, I cannot remember." In addi-

tion to this well reasoned inference on his part, there was other direct and quite satisfactory testimony that the McInturff survey antedated the act of 1884, that it was made in view of the proposed procurement of that act, and that it was intended to be delivered and probably was delivered, along with the draft of the act, to Mr. Grandstaff, who at that time represented the county in the General Assembly.

Undoubtedly, the town authorities in good faith believed that the property of the complainants was situate within the corporate limits, and this belief was shared by the complainants themselves. The complainant, Chandler, bought the lots now owned by him and involved in this litigation in about 1906, when he built upon them, and began to pay taxes to the town. Thereafter he continued to vote for town officials and upon all town questions, until shortly before this suit was brought. In the course of his testimony, he says: "I was sincere in the matter—thought I was within the town until I found that there were no records to show I was in. I quit voting and paying taxes." The complainant, Jarrett, has resided upon the property owned by him and here involved since about the year 1890, and it is in proof in the case that until a comparatively recent date, he has been participating in town elections. He served one or more terms himself as a member of the town council. The decree under review, while reaching a conclusion different from ours as to the true location of the corporate limits, denies the complainants any right to recover taxes previously paid on the ground that such taxes had been paid voluntarily, and recites the following facts which are well established by the evidence and which we deem quite pertinent in this immediate connection: "That the complainants prior to the levy of taxes, the collection of which are enjoined, recognized themselves as living within the corporate limits of Strasburg, voted in its municipal elec-

tions; that one of its complainants actually served as a member of the council of the town though living in the disputed area; that streets were laid through the disputed area by the town, pavements constructed; that complainants received the benefits of the town improvements, and at no time objected to the payment of taxes improperly levied by the town prior to the attempted collection of taxes now enjoined." There must be some explanation in fact for the manifest belief on the part of the town officials and on the part of the complainants that the area in question was within the town, and we think the explanation is most readily and satisfactorily found in the theory that the lines of the McInturff survey were within the contemplation of the act of 1884, and that after the passage of that act, these lines were more or less generally accepted as the true town limits.

Considerable reliance seems to be placed by complainants upon a map of the town of Strasburg introduced by them and found in a printed atlas of the counties of Shenandoah and Page. This map conforms very nearly to the lines of the old map of 1847, and does not include the property now owned by the complainants. Inasmuch as this map was made in 1885, and has been in general use since as a plat of the town, complainants insist that it affords convincing proof of the correctness of their contention. We do not think so. The map was made as a private enterprise, and did not purport to do more than show the lots, streets and alleys of the town. The witness, J. W. Eberly, a resident and official of the town who assisted in making the map and who was interested in the project of completing the atlas of the counties of Page and Shenandoah, testified that he knew of the previous McInturff survey, and also knew, at the time, that the map of 1885 was being made in a way which would not embrace the property now

in dispute, but added: "I want to make this explanation. The purport and intention of this map (1885) was only to show the dwelling places of the citizens of Strasburg as they then lived in their respective homes, and no attempt was made to follow out the corporate lines where there were no houses built. The southeast end in contention was simply then an open field." A conclusive answer to the contention of the complainants as to the significance of this map of 1885 would seem to be found in the undisputed fact that, notwithstanding its existence and alleged general use and recognition, the town authorities as well as many inhabitants of the town, *including complainants themselves,* continued thereafter to regard the exterior corporate limits as extending beyond the mere plat of lots, streets and alleys thereby shown, and as including in particular the very property now in controversy.

[3, 4] Counsel for the complainants call attention to the provision of section 1014 of the Code of 1904, and substantially similar ones found in the statutes of this State since about the year 1845 (Code 1849, chapter 54, sec. 1, page 282; Code 1860, chapter 54, section 1; Code 1887, section 1014). These statutory provisions direct the council of every city and town to make a survey and plan thereof, *showing the lots, streets and alleys therein,* the same to be recorded in the proper clerk's office and in the record books of the municipality, and to be *evidence of the boundaries of said lots, streets and alleys.* We do not see that these statutes have any pertinency to the case at bar. The disputed territory had not been platted at all when the act of 1884 was passed, nor until sometime thereafter. The evidence afforded by the plan contemplated by section 1014 of the Code, and its prototypes, so far as such evidence derives any strength from the statute itself, relates only to "boundaries of the lots, streets and alleys." Many towns and cities em-

brace territory not laid off into lots and not traversed by
streets and alleys.   We are here concerned, not with the
boundary of any lot, street or alley, but with the boundary
of a town in a section which had never been subdivided
when the charter was obtained.   The making, or the failure
to make, the plat required by the statute certainly could
not in any way have affected the complainants, because the
question now before us relates solely to the boundary line
established by the act of 1884 when the complainants' lots
were still unplatted.   In addition to this, the statutes in
question are directory only; and, moreover, the evidence of
boundary, even as to lots, streets and alleys, as provided for
in the statute, is not exclusive of any other satisfactory
method of proof.

[5, 6] In the brief of counsel for the complainants it is in-
sisted that "the annexation of the territory directly in ques-
tion was without any legislative authority whatever directly
or indirectly, by implication or by an express provision of
law, and all acts of the town in relation thereto or in con-
nection therewith were absolutely void and without effect.
or binding force upon these appellees, or upon any other
person."   It is true that the act does not in express terms
declare a purpose to annex new territory, but this, in our
judgment, was not necessary, provided the act used as we
think it did, language sufficient to embrace and definitely
locate territory outside of the former limits of the town.
Under the law as it stood in this State in 1884, it was com-
petent for the legislature to annex new territory, and to
determine for itself the justice and expediency of the
change, regardless of any consent or expression of opinion
by the owners of the territory affected thereby.   There were
no constitutional provisions to the contrary, and in the
absence of such provisions, this is the law everywhere.
*Wade* v. *City of Richmond,* 18 Gratt. (59 Va.) 583; First

Dillon Mun. Corp. (4th ed.), page 267, section 185; 20 Am. & Eng. Enc. L., page 1152; 19 R. C. L., page 732, section 38; 28 Cyc., page 149.

Upon the whole case, we are of opinion to reverse the decree complained of and enter in this court a decree dissolving the injunction and dismissing the complainants' bill.

*Reversed.*