## Richmond

### MELVIN G. LACEY v. JOHN L. CARDWELL, ET AL.

September 5, 1975.

Record No. 740837.

Present, All the Justices.

*Charles E. Carter*, for plaintiff in error.

*Charles R. Warren, Jr.* (*Warren, Parker & Williams*, on brief), for defendants in error.

HARRISON, J., delivered the opinion of the court.

Melvin G. Lacey filed his petition in the court below seeking an attachment against the estates of John L. Cardwell, Lillian M. Cardwell and Annie Cardwell Gosney, residents of California, to satisfy petitioner's claim of $100,000, with interest from July 1, 1973.

Petitioner alleged that the appellees, acting through an agent, contracted to sell him a tract of land in Pittsylvania County, Virginia, containing 284 acres, more or less, for $250,000, and thereafter failed to comply with the agreement. Responsive pleadings were filed, and the lower court, "having considered all the exhibits introduced by stipulation or by depositions but not the depositions", concluded that the negotiations between Lacey and the real estate agent did not "go

beyond the negotiation stage". The court held that the Statute of Frauds was "not satisfied by the writings now made a part of the record", granted appellees' motion for summary judgment and dismissed appellant's petition.

The chronology of this case is important. Dr. John L. Cardwell and his sister, Annie Cardwell Gosney (hereinafter referred to as Cardwell), being desirous of selling their farm in Virginia, employed Steve Bendall, who trades as the John R. Bendall and Company (Bendall), as their sales agent. While there had been previous dealings between Cardwell and Bendall, the first exhibit is a letter dated December 8, 1972, from Bendall to Cardwell, in which he recommended that the property be offered at public auction, subject to Cardwell's confirmation.

On April 18, 1973, Bendall wrote Cardwell a letter enclosing a map that had been prepared designating various parcels of the "Cardwell Farm" which would be offered at auction. This letter discussed the manner in which the auction would be conducted to attract investors, and Bendall expressed the opinion that thereby he could secure $750 to $950 per acre. Bendall further suggested that he be authorized by Cardwell to offer the entire property for the sum of $250,000 to any interested party who inquired before the first auction ad appeared in the paper.

Cardwell responded on April 23rd and agreed that the proposed subdivision plan was logical; that the auction sale was to be conducted on June 30th; and that Bendall be authorized "to offer the entire property for $250,000 to any interested party". Cardwell inquired: "May I reserve the right to refuse a private offer if I so desire?" He also stated that two parties had discussed with him a $200,000 price for the property.

On April 28th Cardwell wrote Bendall: "Confirming our telephone conversation, enclosed is signed auction contract regarding the 'Cardwell Farm'." This contract or agreement, dated April 19, 1973, is signed by Dr. Cardwell and wife, by Dr. Cardwell as attorney-in-fact for Mrs. Gosney, and by Steve Bendall on behalf of the John R. Bendall and Company. The landowners employed Bendall as their exclusive sales agent "to dispose of" their land. It was agreed, among other things, that the agent would conduct a public auction sale on or about June 30th; that terms of the sale were to be "cash on closing . . . but terms of sale may be varied by mutual consent. . ."; and that "[a]ny or all parcels" would be offered subject to seller's right of

confirmation. The final paragraph of the agreement, containing the authority of the agent to make a private sale of the property, reads: "Sales Agent is authorized under this contract to offer the entire property for the sum of $250,000 until June 15, 1973."

The next pertinent exhibit is a "Real Estate Purchase Contract" dated May 7, 1973, signed by Lacey and Bendall. By the terms of this contract Lacey agreed to buy through Bendall as agent for the seller, and the seller agreed to sell the Cardwell farm for $250,000, to be paid $10,000 "down on signing of this contract", $40,000 on delivery of deed, and the balance in annual installments with 6% interest. The name of John L. Cardwell was typed in the space provided for the signature of the seller.

A further exhibit is a contract of sale dated May 10, 1973, prepared by an attorney, William E. Anderson, for the signatures of Lacey, Bendall and the sellers. It embodied more formally the provisions of the May 7th real estate purchase contract and proposed that the $200,000 balance of purchase price be paid in 15 annual installments, bearing 6% interest. This contract bears the signatures and acknowledgments of Lacey and Bendall.

On the same day, May 10th, Anderson prepared an agreement between Bendall and Lacey whereby Bendall agreed that should the terms of the May 10, 1973 agreement be not acceptable to Cardwell, Lacey was to have the privilege of renegotiating the terms and conditions with the seller prior to the property being sold to another party.

On May 11th, Bendall wrote Cardwell, who was then vacationing in Hawaii, and enclosed the May 10th contract prepared by Anderson. Bendall wrote: "This contract is based on the $250,000 figure which I was authorized to quote prior to the auction announcement of June 15. Since no definite terms regarding a private sale were discussed, I have suggested to Mr. Lacey terms which I thought would meet with your general approval." Cardwell was advised that Lacey had made a $10,000 cash deposit on the purchase price, and that the purchaser was financially able to fulfill the terms of the contract.

It also appears from an exhibit that on May 10, 1973, Jamerson C. White and Charles M. Hawker approached Bendall and "inquired about the possible purchase of the property"; that Bendall advised White and Hawker that he had received a contract in the amount of $250,000 and he "considered the property 'SOLD' "; that notwithstanding this, White informed Bendall that he was going to instruct his attorney to prepare a contract to be submitted to Cardwell.

Bendall submitted both contracts in order, he said, to comply with Virginia real estate regulations. The proposed White and Hawker contract called for a sale of the property for $250,000, of which $12,500 was to be deposited with Bendall and the balance was to be paid "in any manner requested" by the seller, with interest not exceeding 8%.

Upon receipt of the two proposed contracts, Cardwell wrote Bendall from Hawaii on May 15, 1973, that the Lacey bid did not appeal to him and that the White-Hawker bid seemed better in many respects. He deferred any decision until he could confer with his California attorney.

On May 18th Bendall acknowledged receipt of Cardwell's letter and requested that Cardwell, upon his return to Sacramento, instruct his California attorney to advise Bendall of the terms which Cardwell would require.

The next development was Cardwell's return from Hawaii and his consultation on June 5th with Francis B. Dillon, his California attorney. In a letter from Cardwell to Bendall, dated June 6, 1973, he enclosed Dillon's typewritten suggestions for the sales contract on the farm. Cardwell observed that the suggestions "seem correct to me". Dillon's memorandum provided for a purchase price of $250,000, a sum not exceeding 30% or $75,000 in cash, the balance to be payable in 8 equal and semi-annual installments, bearing 8% interest.

Thereafter, in a letter from Dillon to Bendall, dated June 26th, Dillon stated that he then represented Cardwell and his sister "for all purposes" in matters concerning the Virginia property; that the offers made by Lacey and by White and Hawker were rejected; that Bendall's authority to negotiate at $250,000 terminated on June 15, 1973; and that Cardwell would sell the property for $300,000 cash.

The contents of Dillon's June 26th letter had been communicated to Bendall over the telephone. Responding thereto on June 27th, Bendall wrote Cardwell, sending a copy to Dillon. After noting that Cardwell had increased the price to $300,000, Bendall recapitulated his various negotiations and agreements with Lacey as follows:

"On Friday, May 4, 1973, I was contacted by Mr. Melvin G. Lacey who had heard that the property was going to be offered for sale at public auction. I advised Mr. Lacey that the property was scheduled for auction on Saturday, June 30, 1973. He then asked me if the property could be purchased prior to the sale date.

I told him I was authorized to quote a price of $250,000 prior to June 15, 1973. Mr. Lacey advised me that he would get in touch with me later if he so wished to give a contract to purchase the property for the above stated figure.

"On Monday, May 7, 1973, Mr. Lacey contacted me and requested that I draw up a contract for $250,000 to purchase the property. I told him that I would; however, I recommended that an Attorney be employed to prepare the contract since I did not want to have any misunderstanding on anyone's part. Attorney William E. Anderson was decided upon to be the Attorney to draw up the contract which he did on May 10, 1973. A copy of which was immediately forwarded to you. Mr. Lacey asked me if I thought terms would be more acceptable to you, taking into consideration your income tax status. I advised Mr. Lacey and Attorney Anderson to prepare a contract setting forth the terms which I considered in your best interest and subject to your approval. Since I did not have a Power of Attorney for you, I could not legally accept or reject his contract proposal.

"It would be up to you as to whether or not you wanted to accept $250,000, cash, or other mutually agreed terms."

In a letter to Dillon dated July 2nd, Bendall wrote: "It was Mr. Lacey's intention to pay $250,000 cash with $10,000 down or $50,000 down and balance of $200,000 on terms."

We deem it unnecessary to review in detail the further exchanges that occurred between the principals. Their dealings involved letters that neither counsel made a part of the printed record and depositions of witnesses which the trial judge did not consider in sustaining defendant's motion for summary judgment. It suffices to note that the telephone calls, conferences and correspondence continued. T. Ryland Dodson, counsel for White and Hawker, made a trip to California on June 15th representing his clients in connection with the purchase of the Cardwell farm. Dillon was retained on June 21st by Cardwell to represent him generally in the matter. On or about July 5th, Lacey, Bendall and Anderson concluded from conversations allegedly had with Dillon and Cardwell that the latter was ready to close the transaction with Lacey on the terms suggested in Dillon's June 5th memorandum. On July 5th Dillon received certain letters which indicated that White and Hawker would pay $300,000 for the property. Thereafter, on July 11th, at the request of Dillon, an auction sale of the

property was conducted by Bendall, at which no one appeared to participate. The property was sold privately to White and Hawker on July 19th for $300,000 cash. On July 19, 1973, Bendall returned Lacey's check for $10,000.

The crux of this case is the April 19, 1973 agreement and the authority the seller vested in his agent. It has long been settled that "[a] real estate agent is not a general agent but a special agent acting under limited power. He is compelled to act within the scope of such power. . . . His usual duty is to find a purchaser ready, able and willing to enter into a contract upon the terms and conditions fixed by the owner, and he has no authority to bind the owner *unless the owner has expressly or by clear, necessary implication authorized him to do so. . . .*" (Italics supplied) *Mason* v. *Hodgson*, 193 Va. 337, 342, 68 S. E. 2d 482, 484 (1952). The authority of an agent acting under special power must be ascertained from the terms of the instrument itself. *Midkiff* v. *Colton*, 242 Fed. 373 (4th Cir. 1917), *aff'd*, 252 Fed. 420 (4th Cir.), *cert. denied*, 248 U. S. 563 (1918). *See also Shanklin* v. *Allis-Chalmers Manufacturing Company*, 254 F. Supp. 223 (S. D. W. Va. 1966), *aff'd*, 383 F. 2d 819 (4th Cir. 1967); 1A M. J., Agency, §23, p. 463.

The background of this litigation is that in December, 1972, Cardwell concluded to sell his property at public auction through a sales agent. The sales agent suggested to the seller that the agent be also authorized to offer the entire property privately in advance of the auction sale. There was no intimation by the agent that the acceptance of such a private offer would be subject also to "acceptance" or confirmation by the seller. On April 23rd Cardwell agreed to an auction sale being held on June 30, 1973, and authorized Bendall "*to offer the entire property for $250,000 to any interested party*". In this letter he inquired if he could reserve the right to refuse a private offer if he so desired. *We find in the record no response to the inquiry.* On th contrary, five days later, April 28th, Cardwell sent Bendall the April 19th agreement signed by him and his wife, and by Cardwell as attorney-in-fact for Mrs. Gosney. The sellers placed no restrictions or limitations on the agent's authorization to sell privately and did not reserve the right to approve the purchaser.

The appellees argue that under this agreement both the auction sale and the private sale were to be made subject to "sellers' right of confirmation". We disagree. Clearly Cardwell reserved the right to accept or reject any bid made for any parcels of the farm sold at public

auction. Bids made at a public auction sale are customarily made subject to confirmation by the seller. Many factors enter into bidding at a public auction sale that are not involved in private sales. The amount the property brings at auction depends not alone upon the desirability of the property, but the extent, type and attractiveness of advertisement, condition of weather on day of sale, the time of sale, presence or absence of prospective bidders, the number of bidders present and their interest in the property.

We think it equally clear that in the agreement of April 19th, Cardwell did not reserve the right to reject any private sale for $250,000 made by his agent until June 15, 1973. Bendall was not authorized to "negotiate" with prospective purchasers, to solicit private "bids" or to receive offers for the land. His only authority to make a private sale was his authority to offer the entire property privately for $250,000 until June 15, 1973. Cardwell had predetermined and fixed $250,000 as the price he would accept for the property. This amount was his "selling price", and Bendall was his agent to make the sale. Obviously he was not interested in who purchased the land for the agent could offer it to anybody, and the terms of sale were not of vital importance for the contract stipulated cash on closing, terms only if *mutually agreeable.*

The whole contract between Cardwell and Bendall is contained within the four corners of the April 19th agreement. When Bendall offered Lacey the Cardwell farm for $250,000 he did exactly what the contract authorized him to do. And when Lacey accepted the agent's offer nothing remained for him to do but to pay the $250,000 in cash. The fact that he and Cardwell might thereafter decide upon terms mutually acceptable is of no consequence, for either had the right to veto any proposed terms other than cash.

It is significant that from May 7, 1973, the day that Lacey accepted the agent's offer to sell the property for $250,000, until Dillon's letter of June 26th, neither the adequacy of the $250,000 consideration nor the suitability or financial responsibility of Lacey was ever questioned. The exchanges between the parties and their attorneys concerned "terms". While Lacey was interested in terms, it was Cardwell's agent who suggested terms because he thought that would be to his principal's tax advantage. In his letter of May 11th to Cardwell enclosing the Lacey contract, Bendall wrote: "Since no definite terms regarding a private sale were discussed, *I have suggested* to Mr. Lacey terms which I thought would meet with your general approval." And

again, on June 27th, Bendall wrote Cardwell: "Mr. Lacey asked me if I thought terms would be more acceptable to you, taking into consideration your income tax status. I advised Mr. Lacey and Attorney Anderson to prepare a contract setting forth the terms *which I considered* in your best interest and subject to your approval." (Emphasis added) What Lacey was inquiring about was whether *terms* would be *more acceptable* to Cardwell than *cash*. Dillon's letter of June 5th to Cardwell dealt also with terms. In fact Dillon stipulated therein that he was not concerning himself with the $250,000 price.

Appellees argue that no purchaser is named in the Dillon letter. While this is true, we think it obvious that the letter primarily responded to the Lacey contract of May 10 prepared by Anderson. The letter addresses itself to the question of tobacco allotment, and to Lacey's proposal that any deferred purchase money deed of trust provide for a release of a portion of the land under certain conditions. Unlike Lacey's contract, the White-Hawker contract contained no reference to tobacco allotment, or to any proposed release of the land from a deed of trust. It further appears from the last line of the Dillon letter that at the time it was written he anticipated that "documents" would thereafter be "coming forward from Virginia".

Appellees contend that there was never any contract of sale, oral or written. They argue that Lacey relies upon parol evidence to prove the acceptance by Cardwell of his offer to purchase and upon parol evidence to prove that he was the purchaser of the land. The fallacy of appellees' position is that Lacey never made any "bid" or any "offer" to purchase the Cardwell farm. Lacey was the offeree, not the offeror. It was Cardwell who "offered" to sell, acting through an agent. Lacey, being fully advised of the agreement between Cardwell and Bendall, deliberated from Friday, May 4th, to Monday, May 7th, and then accepted Cardwell's offer and requested Bendall to draw up a contract to evidence Lacey's purchase of the property for $250,000. The buyer and the seller's agent on that day, May 7, 1973, signed a memorandum in writing, evidencing the purchase. Both seller and buyer were then bound. Thereafter the parties negotiated to determine if they could agree on terms in lieu of cash.

We cannot agree with appellees that under the April 19th agreement Cardwell, having authorized his agent to offer the land privately for a definite sum, had a right to accept or reject an acceptance of the offer. Cardwell's right of confirmation was reserved only as to bids made for "any and all parcels" that would be offered at public auction.

Had he reserved the right to accept or reject an acceptance of his offer to sell for $250,000, it would have negated the authority of the agent to offer the property privately. Further, the price at which "the entire property" was to be offered privately may have been the highest price that Lacey was willing to pay. It is unlikely that Lacey would have disclosed that figure if the seller had a right to reject his acceptance. To have accepted under such circumstances probably would have availed him nothing. It would have done little more than furnish the seller with a reasonably accurate minimum that he could expect to receive for the property at auction. The seller would have had no incentive to have made a private sale to Lacey at that price.

Appellees find comfort in the letter written Bendall by Cardwell on May 15th, expressing a preference for the terms of the White-Hawker contract to those of the Lacey contract. The fallacy of this letter is Cardwell's reference to the Lacey "bid" and to the White-Hawker "bid". Cardwell had two acceptances of his offer, not bids. The exhibits show that Cardwell's offer was communicated to Lacey by Bendall and was accepted by Lacey prior to the alleged acceptance by White and Hawker.

Appellees point to the agreement which was executed by Lacey and Bendall on May 10th. It appears that once Lacey determined to accept Cardwell's offer of $250,000 he wanted memoranda prepared evidencing and protecting his purchase. Bendall was without authority to agree upon any terms other than cash, and Lacey knew that there were others interested in the property and that the transaction was probably destined for future controversy. Lacey wanted Bendall committed in writing to him to the fullest extent possible. Although Bendall may have been uncertain as to the full extent of his authority, his contract with Cardwell gave him the authority to offer the land and thereby make a binding agreement.

As Mr. Justice Whittle observed in *Bowles* v. *Rice*, 107 Va. 51, 52-53, 57 S. E. 575, 576 (1907):

> "The law applicable to the case is clear and well settled. A special agent is defined to be one 'who is authorized to do one or more specific acts in pursuance of particular instructions, or within restrictions necessarily implied from the act to be done.' . . . Persons dealing with such agent do so at their own risk, and cannot rely upon his assumption of authority, but must inform themselves of the extent of his powers.

"The rule is thus stated in *Stainback* v. *Read,* 11 Gratt. 281, at p. 286, 62 Am. Dec. 648: 'It is equally well settled that a party dealing with an agent acting under a written authority must take notice of the extent and limits of that authority. He is to be regarded as dealing with the power before him; and he must at his peril observe that the act done by the agent is legally identical with the act authorized by the power.' [Citing numerous authorities]

"It is also settled law that the powers of a special agent are to be strictly construed; he possesses no implied authority beyond what is indispensable to the exercise of the power expressly conferred, and must keep within the limits of his commission. [Citing authorities] It is moreover the accepted rule, that, in the absence of authority to the contrary, a power to sell implies a cash sale, [Citing authorities] and *a fortiori* the terms of a power expressly prescribing a *cash sale* must be rigidly observed."

In the instant case the authority of the agent to offer the property privately on behalf of his principal was clearly stated in the agreement and that power implied a cash sale. Lacey alleges, and Bendall confirms, that Lacey agreed to pay cash for the land, but was also agreeable to terms if such could be mutually agreed upon.

The situation which developed in *Insurance Co.* v. *Gamble & Co.,* 94 Va. 622, 27 S. E. 463 (1897), parallels somewhat the developments in the instant case. There, the Insurance Company of North America (plaintiff in error) owned damaged cotton left by the steamer "Mattadi" in the City of Norfolk. On January 19, 1895, the company sent from Philadelphia to William Lauder, in Norfolk, a telegram which read as follows:

" 'Offered about forty-two hundred dollars for cotton left behind by Mattadi, about two ninety-four bales. Would you recommend selling whole lot for forty-five hundred dollars, if so will accept that price, notify those making offer.' " 94 Va. at 623, 27 S. E. at 463.

Acting under the authority of the telegram Lauder offered the cotton to R. W. Gamble of Gamble & Co., who had made the offer of $4,200. He exhibited the telegram to Gamble and urged him to buy the cotton at $4,500. Gamble at first declined the offer but subsequently accepted and agreed to take the cotton at the price named.

Thereupon, on the same day, January 19th, Lauder sent the insurance company a telegram which read:

" 'Have sold cotton forty-five hundred dollars, subject your confirmation. I approve sale.' " *Ibid.*

On January 21, 1895, and before the insurance company could respond to this telegram, Lauder received an offer of $4,600 from William D'olier for the cotton, and he advised the company accordingly. Prior to the company's receipt of the $4,600 offer it had advised Lauder by telegram that it approved the sale to Gamble for $4,500. Lauder withheld from Gamble this information until he received the company's reply to the $4,600 offer. The reply came from the company instructing Lauder to accept the $4,600 offer if he had not closed with Gamble. Lauder thereupon sold and delivered the cotton to D'olier for $4,600, and Gamble & Co. sued for the damages sustained by reason of the failure of the insurance company to deliver the cotton to it. The court held:

"It is admitted that telegram No. 1, received by Lauder, conferred upon him full authority to sell the cotton for $4,500, if he approved. Lauder exhibited this telegram to R. W. Gamble, and offered him the cotton at the price named. Gamble accepted the offer unconditionally, and Lauder informed his principal of the sale per telegram No. 2. The words 'subject your confirmation,' contained in that telegram were inserted by Lauder after the sale was closed, he preferring, in his own interest, to have his authority re-affirmed. It was not the understanding of the parties that these words should qualify Gamble's rights, *which were fixed immediately upon his acceptance of Lauder's offer.*

"In the light of the evidence we do not think confirmation of the sale by the insurance company was necessary. Lauder had full authority under telegram No. 1 to make the sale at $4,500. *He made the offer in pursuance of his authority, and Gamble accepted it without qualification or condition. Nothing further was necessary to give effect to the contract. The transaction was complete so as to bind both parties upon the acceptance of the offer by Gamble.* Because Lauder chose in his own interest to have his authority to make the sale re-affirmed by his principal could not prejudice the rights of Gamble, unless it was the understanding between them

that the matter should be kept open for such confirmation, and the evidence does not warrant that conclusion." (Italics supplied) 94 Va. at 625, 27 S. E. at 464.

The court decided, as we do in the instant case, that the rights of the seller and buyer were fixed immediately upon the buyer's acceptance of the agent's offer. Lauder, as did Bendall, had some reservations as to the full extent of his authority. The court held that confirmation of the sale by the company was not necessary for Lauder had full authority under the telegram to make the offer and the sale at $4,500. In the instant case Bendall had the authority to make the offer and the sale for his principal. Gamble accepted the offer without qualification or condition, as Lacey is alleged to have done.

In *Green's Ex'ors* v. *Smith*, 146 Va. 442, 452, 131 S. E. 846, 848 (1926), it was held:

> "It is elementary that mutuality of assent—the meeting of the minds of the parties—is an essential element of all contracts, and, in order that this mutuality may exist, it is necessary that there be a proposal or offer on the part of one party and an acceptance on the part of the other. Both the offer and acceptance may be by word, act or conduct which evince the intention of the parties to contract, and that their minds have met may be shown by direct evidence of an actual agreement, or by indirect evidence of facts from which an agreement may be implied. [Citations omitted]"

*See also Lynch* v. *Highfield*, 146 Va. 488, 500, 131 S. E. 810, 813 (1926).

In *Spenard Plumbing & Heating Co.* v. *Wright*, 370 P. 2d 519, 524-25 (Alaska 1962), the court said:

> "Professor Corbin defines an offer as 'an expression by one party of his assent to certain definite terms, provided that the other party involved in the bargaining transaction will likewise express his assent to the identically same terms.' The making of the offer, he points out, 'creates a power of acceptance in the offeree,' and once the offer has been made there is nothing left for the offeror to do but to wait for the offeree to close the contract. 1 Corbin, Contracts § 11, at 21-22 (1950)."

In *Townsend* v. *Stick*, 158 F. 2d 142 (4th Cir. 1946), where specific performance was decreed, the facts were that Stick inquired of Town-

send if the latter was interested in selling a tract of land at a price in the neighborhood of $30,000. Later Stick again wrote, "suggesting a cash deal for $30,000". Townsend's secretary replied: "Townsend has decided that . . . he will sell the tract for thirty thousand dollars ($30,000.00) cash, on immediate sale." Stick responded: "My associates and myself are prepared to close immediately at the price quoted, $30,000". The buyer indicated that, pending title examination, he would make a substantial payment on the contract or on an option, or would place the entire purchase price in escrow.

In *Townsend* it was contended that the seller had made no offer capable of acceptance, that material terms had not been agreed upon and that there was a lack of mutuality. The court said: "It is difficult to see how a much plainer offer could be made than by the statement '—if you are interested in this tract,—he will sell the tract for thirty thousand dollars ($30,000.00) cash, on immediate sale.' " The court said, "it seems clear that Stick intended to accept Townsend's offer without modification of any material element of that offer. . . . The proposals of alternative methods of paying the purchase price seem to relate solely to the performance of the contract and not to its creation". Townsend also claimed that essential elements of the contract were still under negotiation, referring to the nature of the final agreement, manner of reserving oil and mineral rights, time, place and amount of payment of the purchase price, time to be allowed for survey, title examination and removal of title defects, quantity of land sold, character of title to be guaranteed and identity of purchasers. The court said:

> "We have examined these contentions closely and are convinced that they are either matters of performance rather than matters involved in the formation of the contract, or that they are substantially covered by the contract or would be implied by law." *Townsend* v. *Stick, supra,* at 145.

The court said: "Finally, Stick bound himself by his letter of acceptance, whether or not anyone else was bound with him." *Id.* at 145.

Our view of this case makes it unnecessary that we review the authorities cited by counsel. The order of the trial court sustaining appellees' motion for summary judgment was based upon their allegation that the documents made a part of the record did not severally or jointly constitute a writing sufficient to satisfy the Statute of Frauds.

The ruling of the trial court was made in light of its conclusion that the writings did not show that Cardwell "confirmed" a contract of sale with Lacey. It is our holding that, under the facts alleged and those reflected by the exhibits, such confirmation by Cardwell was not necessary or required if Lacey, as he claims, in fact, accepted appellees' offer to sell the entire property involved for $250,000 cash, and communicated such acceptance to the sellers or to Bendall, their agent, prior to June 15, 1973. Having so decided, it is clear that the stipulated exhibits constitute sufficient memoranda in writing to satisfy the Statute of Frauds.

Accordingly, we hold that the trial court erred in granting appellees' motion for summary judgment. Its final order granting the motion is reversed, and the cause is remanded for further proceedings not inconsistent with the views expressed in this opinion.

*Reversed and remanded.*

COMPTON, J., concurs in result.