# Richmond

## W. B. CHITTUM, SHERIFF OF ROCKBRIDGE COUNTY, ETC. v. CHARLES A. POTTER, JR., ET AL., ETC.

December 1, 1975.

Record No. 741013.

Present, I'Anson, C.J., Carrico, Harrison, Cochran, Poff and Compton, JJ.

*Thomas C. Spencer; William O. Roberts, Jr.* (*Spencer & Crawford*, on brief), for appellant.

*Wayt B. Timberlake, Jr.* (*Timberlake, Smith, Thomas & Moses*, on brief), for appellees.

COCHRAN, J., delivered the opinion of the court.

W. B. Chittum, Sheriff of Rockbridge County, as personal representative of the estate of Richard B. Macgurn, deceased, filed an

amended bill of complaint in the trial court seeking specific performance by Charles A. Potter, Jr., of an alleged contract for the sale to Macgurn of certain real estate. The chancellor ruled that the evidence, which he heard *ore tenus*, failed to establish a contract. He dismissed the suit by final decree entered June 14, 1974, which the personal representative has appealed.

In early 1972, Potter obtained an option to purchase the Earl Roberts farm in Rockbridge County for $41,000. Before exercising the option Potter entered into negotiations to sell the property at a higher price to Macgurn. William B. McClung, Potter's attorney and friend, who had assisted him in obtaining the option, listed the property with W. E. Tilson and Son, a real estate agency in Lexington. In Tilson's office McClung wrote on a sheet of paper Potter's name and telephone number, McClung's name and telephone number, the owner and acreage of the farm to be sold, the asking price of $60,000, and other matters relating to financing.

Macgurn, a California resident, submitted an offer in the form of a contract which he had signed, providing for a purchase price of $58,000 for the property, a $3,000 down payment, financing arrangements as specified in the listing, and settlement on or before April 15, 1973. On May 17, 1972, McClung wrote to Tilson, enclosing Macgurn's contract, unsigned by Potter, stating that Potter had agreed to the $58,000 price and to the closing date of April 15, 1973, but that he required an escrow deposit of $5,000. McClung enclosed an unsigned contract that included these terms and a provision that Macgurn would lease the property to Potter from April 15, 1973 to April 14, 1974, for the sum of $1,800. Tilson forwarded this contract to Macgurn.

By letter dated June 8, 1972, Macgurn's California attorney, Eugene L. Wolver, Jr., informed Tilson that Macgurn would not pay more than the $3,000 deposit, but that he was willing to close immediately, and that he would agree to the one-year lease. The letter also stated that "if the above is not acceptable, kindly consider the matter closed and [Macgurn's] offer withdrawn".

On July 6 McClung wrote to Wolver and stated that, after discussing the matter with Potter, he "believe[d] that we can work out the following: (1) The settlement will be held on October 15, 1972. (2) Mr. Potter will lease the property from Mr. Macgurn for a period of one year from October 15, 1972, to October 14, 1973, for the sum of $1800. . . ." No reference was made to the amount of the deposit.

Wolver replied by letter of July 21 that Macgurn "wish[ed] . . . the settlement date" to be April 15, 1973, "as contracted and agreed upon"; but that in all other respects McClung's letter of July 6 was satisfactory. He too made no reference to the amount of the deposit.

McClung wrote a letter to Wolver dated August 7 with a copy to Tilson, stating that Potter had declined to accept Macgurn's offer because Macgurn would not agree to the October 15 settlement date and to the increase of the deposit to $5,000. Tilson received his copy of the letter on August 10 and went immediately to McClung's office. He testified that McClung told him that if Macgurn, before receiving McClung's August 7 letter, wrote a letter "accepting my previous letter . . . and sending the two thousand dollars . . . there's no way . . . that [Potter] could get out of it. . . ." At Tilson's request, McClung drafted language for a telegram to be sent by Macgurn.

Tilson telephoned Wolver in Los Angeles to advise him of the letter coming from McClung and to suggest that Macgurn send the proposed telegram. Wolver, in Macgurn's presence and with his approval, sent to Tilson a telegram from Macgurn containing the language drafted by McClung and transmitted by Tilson.[1] Macgurn thereafter mailed to Tilson the contracts dated May 1 prepared by McClung, which Macgurn had executed, and $2,000 to increase the escrow deposit to $5,000. Wolver testified that he received McClung's August 7 letter the day after he dispatched the telegram to Tilson. Potter never signed any contract.

Although the amended bill of complaint alleged that McClung was Potter's attorney and agent, Macgurn's personal representative undertook to show at trial that McClung was Potter's partner or joint venturer in the negotiations with Macgurn. Tilson and his son testified that McClung asked them "to sell the farm for him and . . . Potter". Tilson also said that McClung asserted that he was furnishing the money with which Potter was to exercise the option. In a cover letter to Tilson, enclosing a copy of his August 7 letter to Wolver, McClung referred to the price "[Potter] and I agreed to

---

[1] The telegram contained this message:

"THIS IS TO INFORM YOU I HAVE EXECUTED THE CONTRACTS FORWARDED BY CHARLES POTTER JR PERTAINING TO THE ROBERTS FARM AT COLLIERSTOWN VIRGINIA AND AM FORWARDING A CHECK FOR 2000.00 TO BE ADDED TO THE ESCROW ACCOUNT THUS I AM ACCEPTING HIS ORIGINAL COUNTER OFFER AS FORWARDED TO ME AND AS EXPLAINED IN HIS ATTORNEYS LETTER OF JULY 6 1972 AND AM RETURNING THE SAME FOR HIS SIGNATURE

RICHARD B. MACGURN."

take", and told Tilson not to make any further efforts to sell the property until he received a listing signed by both Potter and McClung, "or however the property will be titled. . . ."

Potter and McClung testified that McClung was to receive a share of the profit, had the sale been consummated, but that no agreement had been reached as to his percentage. McClung advanced Potter an interest-free loan of $5,000 and received from him, after Potter acquired title in September, 1972, a bearer note for $9,000, covering the loan and legal services, secured by a second deed of trust on the property. Potter testified that it was only after he decided not to sell the farm that he reached agreement with McClung as to the latter's compensation. Both Potter and McClung testified that Mc-Clung acted as attorney for Potter, with authority only to negotiate a contract, subject to Potter's approval, and that McClung had no ownership interest in the property. McClung conceded that he had drafted the language for Macgurn's telegram in the hope that the telegram and the contracts executed by Macgurn would persuade Potter to consummate the sale.

We first dispose of the question of McClung's status. The personal representative argues that the evidence that McClung would be compensated out of the profit from the sale showed that Mc-Clung was Potter's partner.[2] The sharing of profits, however, is not a conclusive test of partnership. *Walker Co.* v. *Burgess*, 153 Va. 779, 151 S.E. 165 (1930).

In the correspondence between Tilson and Macgurn, and between McClung and Wolver, McClung was invariably referred to as Potter's attorney. Moreover, the testimony of McClung and Potter, if believed, sufficiently rebutted any presumption that McClung was Potter's partner. The only evidence to the contrary, other than the plan whereby McClung would be compensated out of profit from the sale, was the testimony of Tilson and his son, the presence of Mc-Clung's name on the listing memorandum, and the ambiguous lan-

---

[2] Code § 50-7 provides:

"In determining whether a partnership exists, these rules shall apply:

• • •

"(4) The receipt by a person of a share of the profits of a business is prima facie evidence that he is a partner in the business, but no such inference shall be drawn if such profits were received in payment:

"(a) As a debt by installments or otherwise;

• • •

"(d) As interest on a loan, though the amount of payment vary with the profits of the business;"

guage used in McClung's August 7 letter to Tilson. McClung may have led the Tilsons, who were also Potter's agents, to believe that he was Potter's partner, but there is no evidence that Macgurn or his attorney, Wolver, believed that the seller was anyone but Potter alone, or that McClung was acting in any capacity other than as attorney for Potter, with authority limited to negotiation of a contract, subject to his client's approval.

We cannot say as a matter of law that, in finding from the evidence that McClung was acting only as attorney and agent for Potter, the chancellor erred. His finding carries the weight of a jury verdict and will not be disturbed by us unless plainly wrong or without evidence to support it. *McCauley* v. *Phillips*, 216 Va. 450, 219 S.E.2d 854, this day decided.

■ Correspondence between parties can result in a binding contract if the letters and telegrams, fairly construed, correctly express all of the terms to which the parties agree, even though the parties understand that the agreement shall thereafter be expressed in a formal writing. *Manss-Owens* v. *Owens & Son*, 129 Va. 183, 196, 105 S.E. 543, 547 (1921). It is crucial to a determination that a contract exists, however, that the minds of the parties have met on every material phase of the alleged agreement. *Belmont* v. *McAllister*, 116 Va. 285, 303, 81 S.E. 81, 87 (1914). Thus, in *Lacey* v. *Cardwell*, 216 Va. 212, 217 S.E.2d 835 (1975), where a landowner authorized his agent to offer certain real estate for sale on certain terms, we held that a purchaser's acceptance of that offer, without qualification of those terms, constituted a binding contract.

Potter, through his attorney, McClung, listed the Earl Roberts farm for sale for $60,000. Macgurn submitted an offer of $58,000 in a proposed contract dated May 1, 1972. McClung's letter of May 17, 1972, in which he stated that Potter agreed to the purchase price of $58,000 and the proposed settlement date of April 15, 1973, but insisted upon an increase in the deposit to $5,000 and a one-year lease back to Potter, constituted a counter offer, and hence, a rejection of Macgurn's offer. *Va. Hardwood Lbr. Co.* v. *Hughes*, 140 Va. 249, 258, 124 S.E. 283, 286 (1924). In his reply of June 8, 1972, Macgurn, through his attorney, rejected the counter offer, by refusing to increase the escrow deposit and requesting an immediate settlement date.

In his letter of July 6, 1972, McClung stated that Potter desired to retain possession of the property until he harvested his crops and sold his cattle, and that this desire "was a condition of sale rather

than a request of the seller. . . ." McClung then expressed his belief that agreement could be reached on certain specified provisions, including the October 15, 1972 settlement date and the lease back, and Macgurn was requested to advise if these provisions were satisfactory. McClung made no reference to the increased deposit that Potter had previously demanded. The personal representative contends that it is reasonable to infer from this omission that Potter had agreed to the $3,000 deposit. We believe that a more reasonable inference from the language used in this letter is that McClung was preserving the negotiations by encouraging Macgurn to renew his previous offer with the specified provisions included and with no increase in the initial deposit of $3,000, which McClung felt that he could then persuade Potter to accept.

If we assume, however, that this letter of McClung's constituted a counter offer, Wolver's reply of July 21 was at most a conditional acceptance, requiring Potter's consent to the proposed change back to the April 15, 1973 closing date, and the $3,000 deposit. After Macgurn's earlier adamant refusal to increase the deposit it is unreasonable to infer, as his personal representative alternatively argues, that by not referring to the deposit, Wolver's letter showed that Macgurn tacitly acceded to Potter's demand for a $5,000 deposit.

In order to form a contract there must be no material variance between the acceptance and the offer. Having once rejected an offer by his conditional acceptance, a party cannot afterwards bind the offeror by tendering an unconditional acceptance. *Richeson* v. *Wilson*, 187 Va. 536, 546, 47 S.E.2d 393, 398 (1948). Thus, Macgurn could not bind Potter by an unconditional acceptance of an offer that he had already rejected by conditional acceptance. We conclude from a fair reading of the correspondence between the agents for the parties that the proposed sale never passed beyond the negotiating stage to a binding contract.

Furthermore, there is evidence to support the chancellor's finding that Potter's revocation of his offer to sell had been communicated to Macgurn before Macgurn attempted to bind Potter by the telegram of August 10. An offer becomes inoperative if it is not accepted before it has been withdrawn. *Crews* v. *Sullivan*, 133 Va. 478, 483, 113 S.E. 865, 867 (1922). Tilson testified that he telephoned Wolver and informed him that a letter from McClung would arrive which contained Potter's termination of all negotiations. This information placed Macgurn on notice that neither Tilson nor McClung had authority to bind Potter by any further dealings with Macgurn.

Any steps taken thereafter by Macgurn, Wolver, Tilson, or McClung to save the proposed sale were taken at their own risk and could not prejudice Potter's rights. The authority of a special agent must be strictly pursued, and if the agent exceeds his authority, his principal is not bound; and one who deals with the agent, knowing that he has exceeded his authority, does so at his peril. *Seergy* v. *Morris Realty Corp.*, 138 Va. 572, 577, 121 S.E. 900, 902 (1924).

Accordingly, we hold that the chancellor did not err in ruling that the evidence failed to establish a valid contract between Potter and Macgurn.

*Affirmed.*