COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Chief Judge Decker, Judges Ortiz and Chaney
Argued at Fairfax, Virginia


RESSA CONSTRUCTION, INC.

MEMORANDUM OPINION* BY
v.          Record No. 0627-24-4                     JUDGE DANIEL E. ORTIZ
                                                                SEPTEMBER 30, 2025
JASON DILLAMAN, ET AL.


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Stephen C. Shannon, Judge

James N. Markels (Glenn W. D. Golding; Croessmann & Westberg,
PC, on briefs), for appellant.

John C. Altmiller (Rebekah S. Green; Altmiller Melnick DeMers
Steele & Rosati PLC, on brief), for appellees.

Amicus Curiae:  Professional Remodeling Organization, Inc. and
Professor Steven G. Shapiro (Kevin W. Weldon, on brief), for
appellant.[1]


In 2021 Jason and Natasha Dillaman ("the Dillamans") entered into a purported contract

with Ressa Construction, Inc. ("Ressa") to remodel their home.  After a series of modifications to

the architectural plans, during which the price rose by nearly 50%, the Dillamans decided not to

proceed, and requested the return of their first payment.  Ressa refused, and the Dillamans sued,

arguing among other things that the purported contract lacked material terms necessary to render

it enforceable.  Ressa appeals the circuit court's final order entering judgment for the Dillamans

on their claims for unjust enrichment and conversion and against Ressa on its counterclaim for

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] Professional Remodeling Organization, Inc., and Professor Steven G. Shapiro jointly
filed an amicus curiae brief and moved for leave to file the brief in support of the appellant.  This
Court granted the motion for leave to file the amicus brief.

breach of contract. Ressa argues the circuit court erred by concluding that a document the parties signed was an unenforceable agreement to agree, and therefore erred by overruling Ressa's demurrer, denying Ressa's motions to strike at trial, and entering final judgment for the Dillamans. Because we agree with the circuit court that the agreement was unenforceable, we affirm.

BACKGROUND[2]

In early 2021, the Dillamans decided to renovate their home. They engaged an architect, Jon Hensley, to develop plans ("pricing plans") so they could better understand what their envisioned renovation would cost and whether they could afford it. On the Dillamans' behalf, Hensley sent the pricing plans and a cover letter describing the scope of proposed work to various contractors, including Ressa, to solicit bids. Hensley's bid solicitation package included 6 pages of written description of the proposed scope of work followed by 17 pages of scaled architectural drawings showing before-and-after plans for each floor of the Dillamans' house. The first page of Hensley's letter stated, however, "[t]his package of information is intended only to get a sense of rough cost for the scope of work described and is acknowledged to be incomplete of the details and information required to provide a complete bid."

On March 31, 2021, Ressa sent the Dillamans an estimate quoting a price of $398,667.60. The estimate included an itemized list of material and labor costs, a summary of the project

---

[2] Generally, on appeal of a judgment rendered by a circuit court after a bench trial, we "view the evidence and all reasonable inferences drawn from it in the light most favorable to . . . the prevailing party at trial." *Moncrieffe v. Deno*, 76 Va. App. 488, 496 (2023) (alteration in original) (quoting *Palmer v. R.A. Yancey Lumber Corp.*, 294 Va. 140, 159 (2017)). The only issue we are deciding in this appeal is the meaning of a purported contract the terms of which are unambiguous. *See infra.* Thus, the parol evidence introduced by the parties at trial is inadmissible and we recite only the minimum facts necessary to provide context to this opinion. *See Golding v. Floyd*, 261 Va. 190, 192-93 (2001).

objectives, and a preliminary timeline based on the information Hensley provided and a site inspection Ressa had conducted.

On April 30, 2021, the parties signed a document that purported to engage Ressa to perform the renovation. The purported contract included a "lump sum price" to complete the renovation of $398,667.00. In a section titled "General Scope of Work Description," the purported contract provided that Ressa would "Renovate/Remodel house with labor and materials as described in Exhibits A and B attached hereto and incorporated by referral." Exhibit B was the March 31, 2021 estimate and timeline Ressa had provided to the Dillamans. The purported contract described Exhibit A as "Forthcoming Owner/Contractor endorsed permit approved plans." Exhibit B was attached to the purported contract; Exhibit A was not.

The purported contract provided that the Dillamans would pay 10 equal installments of $39,866.70 over the course of the project's completion. The Dillamans paid Ressa the first installment on April 30, 2021. Among other provisions, the purported contract also included a section providing that the parties could negotiate and execute "change orders" to alter or deviate from the agreed scope of work.

In July 2021, the Dillamans submitted a set of building plans to Fairfax County for permitting and also provided a copy to Ressa. The submitted plans were substantially different from Hensley's pricing plans, in part because of changes the Dillamans requested after April 30, 2021. The county approved the plans in March 2022. Ressa then conducted a reconciliation to update the price of the work based on the differences between the pricing plans and the county-approved plans, as well as changes in material costs that had occurred since April 2021. Ressa sent the Dillamans an updated project budget estimating a price of $596,221, nearly $200,000 more than the "lump sum price" included in the purported contract. That price

included $122,697 in "scope changes" from the pricing plans based on changes the Dillamans had requested.[3]

After learning the new estimated cost of the project, the Dillamans decided not to proceed. Ressa informed the Dillamans that their decision to stop work on the project was a breach of the April 30, 2021 contract. The Dillamans, in response, took the position that the purported contract was an unenforceable agreement to agree because it did not clearly establish the scope of work and the price. The Dillamans requested the return of their initial payment of $39,866.70, which Ressa refused.

The Dillamans sued seeking return of their initial payment and asserting claims for unjust enrichment, conversion, and in the alternative breach of contract and violation of Code § 43-13. Ressa filed a counterclaim for breach of contract and attorney fees. Ressa demurred to the Dillamans' claims, arguing that there was an enforceable contract, so neither the Dillamans' unjust enrichment nor conversion claim could survive. Ressa argued that the Dillamans' other claims were meritless for similar reasons. The circuit court overruled the demurrer.

The case went to a bench trial. Ressa moved to strike after the Dillamans rested their case in chief, again arguing that the Dillamans' claims were barred by the existence of an enforceable agreement. The circuit court denied it. Ressa renewed its motion to strike after resting its case, and the court took the motion under advisement.

In support of its motions to strike and in closing argument, Ressa asserted that the estimate in Exhibit B (which was based on the pricing plans and bid solicitation information provided by Hensley) fully described the scope of work. Under Ressa's interpretation, any variation between the work contemplated in Exhibit B and the final permit plans in Exhibit A

---

[3] Also included in the updated price were a charge of $39,863 for a "basement option," which the April 30, 2021 purported contract had provided the Dillamans could add, and $34,994 in price increases for materials that had occurred since the contract's execution.

would need to be addressed through change orders, as is common in the construction industry. Even if the Dillamans did not agree to the price increases in any change order, Ressa argued "the parties were still left with the previous scope that was agreed to" in Exhibit B. Thus, according to Ressa, because the parties intended to define the scope of work through Exhibit B, and Exhibit B existed at the time the contract was signed, the parties therefore had a meeting of the minds as to the scope of work at the time the contract was signed.

The Dillamans asserted that the contract language describing Exhibit A plainly and unambiguously showed the parties intended to further negotiate the scope of the work. According to the Dillamans, Exhibit A was acknowledged to be "forthcoming," meaning it did not yet exist, and moreover Exhibit A needed to be "endorsed" by both parties, and depended on being "permit approved" by Fairfax County officials. The estimate and Hensley's preliminary plans, the Dillamans argued, were insufficiently detailed to reasonably define the scope of work for this complex construction project. Thus, under the Dillamans' theory, the language of the contract unambiguously demonstrated the parties intended to continue to negotiate the scope of work at the time they signed the contract on April 30, 2021, and there was no meeting of the minds.

After the parties made closing arguments, the court ruled in the Dillamans' favor, concluding the purported contract was an unenforceable agreement to agree. The court reasoned that Exhibit A did not exist at the time the contract was signed, and Exhibit A defined the scope of the work, which was a material term of the contract. The court also noted that the lump sum price listed in the contract was only an estimate. Thus, the court entered judgment in favor of the Dillamans on their unjust enrichment and conversion claims, awarding them damages of $39,866.70. The court denied the Dillamans' breach of contract and Code § 43-13 claims, as well as Ressa's counterclaim.

On appeal, Ressa argues the court erred in concluding the purported contract was an unenforceable agreement to agree, and therefore the court erred by overruling Ressa's demurrer, denying Ressa's motions to strike, entering final judgment for the Dillamans on their unjust enrichment and conversion claims, and entering final judgment for the Dillamans on Ressa's counterclaim for breach of contract.[4]

ANALYSIS

For an enforceable agreement to exist, the parties must fully agree to terms rendering the alleged agreement sufficiently certain and complete. *See Dean v. Morris*, 287 Va. 531, 537 (2014). "The element of completeness denotes that the contract embraces all the material terms; that of certainty denotes that each one of those terms is expressed in a sufficiently exact and definite manner." *Id.* (quoting *Smith v. Farrell*, 199 Va. 121, 127 (1957)). Both elements are "essential" to an enforceable contract. *Id.* (quoting *Smith*, 199 Va. at 127). "It is crucial to a determination that a contract exists . . . that the minds of the parties have met on *every material phase of the alleged agreement*." *Chittum v. Potter*, 216 Va. 463, 467 (1975) (emphasis added). And "[t]here must be mutual assent of the contracting parties to terms reasonably certain under the circumstances." *Navar, Inc. v. Fed. Bus. Council*, 291 Va. 338, 345 (2016) (quoting *Allen v. Aetna Casualty & Surety Co.*, 222 Va. 361, 364 (1981)). More specifically, material terms to a service contract like the one in this case include "the nature and extent of service to be performed, the place where and the person to whom it is to be rendered, and the compensation to

---

[4] Ressa asserts five assignments of error relating to the circuit court's various decisions on its demurrer, its motions to strike, and in entering final judgment for the Dillamans. Each assignment is dependent on Ressa's argument that an enforceable contract exists. Because, as discussed *infra*, we resolve that issue based solely on the unambiguous text of the contract and in favor of the Dillamans, we need not discuss the circuit court's decisions under separate rubrics. It is a legal question subject to our de novo review in each instance. *See Wilburn v. Mangano*, 299 Va. 348, 352-56 (2020); *Navar, Inc. v. Fed. Bus. Council*, 291 Va. 338, 343-48 (2016); *Babcock & Wilcox Co. v. Areva NP, Inc.*, 292 Va. 165, 178 n.6 (2016); *Golding*, 261 Va. at 192-93; *W.J. Schafer Assocs. v. Cordant, Inc.*, 254 Va. 514, 519 (1997).

be paid." *Reid v. Boyle*, 259 Va. 356, 370 (2000) (quoting *Mullins v. Mingo Lime & Lumber Co.*, 176 Va. 44, 50 (1940)). "[A]greements to negotiate at some point in the future are unenforceable" because they fail to define these material terms. *Navar*, 291 Va. at 346 (quoting *Cyberlock Consulting, Inc. v. Info. Experts, Inc.*, 939 F. Supp. 2d 572, 578 (E.D. Va. 2013), *aff'd*, No. 13-1599, 549 Fed. Appx. 211 (4th Cir. Jan. 8, 2014)).

Before determining whether an enforceable agreement exists in this case, however, we must first determine whether the purported contract is ambiguous. "When a written agreement is clear and unambiguous, it is the duty of a court, not a jury, to determine whether an enforceable contract exists." *W.J. Schafer Assocs. v. Cordant, Inc.*, 254 Va. 514, 519 (1997). In such a case, parol evidence regarding the parties' intent is inadmissible, and we limit our review to the four corners of the document. *Id.*; *see Babcock & Wilcox Co. v. Areva NP, Inc.*, 292 Va. 165, 178 n.6 (2016). "[W]hether the [document] contains the requisites of an enforceable contract is a matter of law" to which we apply a de novo standard of review. *W.J. Schafer Assocs.*, 254 Va. at 519.

Conversely, "[w]hen the terms of an agreement are ambiguous, a court will consider parol evidence to ascertain the intent of the parties." *Video Zone, Inc. v. KF&F Props., L.C.*, 267 Va. 621, 626 (2004); *see Main-Atlantic Corp. v. Francis I. Dupont & Co.*, 213 Va. 180, 184 (1972); *Babcock & Wilcox Co.*, 292 Va. at 178 n.6. And, if a contract is ambiguous, a court acts as factfinder when it looks outside the document to determine the parties' intent. Code § 8.01-680. In such cases, we cannot set aside the circuit court's judgment about the contract's enforceability as contrary to the evidence "unless it appears from the evidence that such judgment is plainly wrong or without evidence to support it." *Id.*; *see Main-Atlantic Corp.*, 213 Va. at 184; *Video Zone, Inc.*, 267 Va. at 626-28. Thus, whether the contract is ambiguous determines the admissibility of parol evidence, the nature of the lower court's decision, and the

standard of review we must apply on appeal.[5]  *See Video Zone, Inc.*, 267 Va. at 626; *Babcock &*

*Wilcox Co.*, 292 Va. at 178 n.6.

"[A]n ambiguity, if it exists, must appear on the face of the instrument."  *Video Zone,*

*Inc.*, 267 Va. at 626; *see Golding v. Floyd*, 261 Va. 190, 192-93 (2001).  "The guiding light in

the construction of a contract is the intention of the parties as expressed by them in the words

they have used, and courts are bound to say that the parties intended what the written instrument

plainly declares."  *Bolton v. McKinney*, 299 Va. 550, 554 (2021) (quoting *Schuiling v. Harris*,

286 Va. 187, 192 (2013)).  "[A] contract is not ambiguous simply because the parties to the

contract disagree about the meaning of its language."  *Babcock & Wilcox Co.*, 292 Va. at 179

(quoting *Pocahontas Mining L.L.C. v. Jewell Ridge Coal Corp.*, 263 Va. 169, 173 (2002)).

Rather, a contract is ambiguous "if its language admits of being understood in more than one

way or refers to two or more things at the same time."  *RECP IV WG Land Investors LLC v.*

*Capital One Bank (USA), N.A.*, 295 Va. 268, 283 (2018) (quoting *Wetlands America Trust, Inc.*

*v. White Cloud Nine Ventures, L.P.*, 291 Va. 153, 161 (2016)).  Conversely, a contract is

unambiguous "if its provisions are capable of only one reasonable construction."  *Id.* (quoting

*Wetlands America Trust, Inc.*, 291 Va. at 161).  "In determining whether the disputed terms are

ambiguous, we consider the words employed in the contract in accordance with their usual,

ordinary, and popular meaning."  *Video Zone, Inc.*, 267 Va. at 626.  And "when considering the

meaning of any part of a contract, we will construe the contract as a whole."  *Babcock & Wilcox*

*Co.*, 292 Va. at 179 (quoting *Doctors Co. v. Women's Healthcare Assocs., Inc.*, 285 Va. 566, 572

---

[5] According to Ressa, the parties agree that the purported contract in this case is unambiguous.  But "[t]he question whether the language of a contract is ambiguous is a question of law," *Eure v. Norfolk Shipbuilding & Drydock Corp.*, 263 Va. 624, 631 (2002), and "a question of law . . . is not subject to a concession binding on this Court," *Va. Marine Res. Comm'n v. Chincoteague Inn*, 287 Va. 371, 389 (2014) (alteration in original) (quoting *Wright v. Commonwealth*, 278 Va. 754, 760 n.3 (2009)); *see also Cofield v. Nuckles*, 239 Va. 186, 194 (1990) ("A party can concede the facts but cannot concede the law.").

(2013)).  "No word or clause in the [contract] will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly."  *Wetlands Am. Trust, Inc.*, 291 Va. at 161 (quoting *Squire v. Va. Housing Dev. Auth.*, 287 Va. 507, 516 (2014)).  With these principles in mind, we turn to the case at hand.

Here, the potential ambiguity in the purported construction contract arises from the provision defining the scope of work.  That provision stated that Ressa would "Renovate/Remodel house with labor and materials as Described in Exhibits A and B attached hereto and incorporated by referral."  The provision further described Exhibit A, which was not attached to the contract and did not exist when the parties signed the agreement, as "Forthcoming Owner/Contractor endorsed permit approved plans."  The purported contract did not otherwise explain the contents of Exhibit A, how Exhibit A would be created, or when it would be "forthcoming."  The existing exhibit, Exhibit B, was the price estimate Ressa prepared, which included an itemized list of material and labor costs, a summary of the project objectives, and a preliminary timeline.  The estimate stated that it was based on a site inspection Ressa conducted and the pricing plans and information provided by Hensley in his bid solicitation package. Hensley's bid solicitation package, in turn, included 17 pages of scaled architectural drawings showing before-and-after plans for each floor of the Dillamans' house, along with 6 pages of written description of the proposed scope of work.[6]  The first page of Hensley's letter stated, however, "[t]his package of information is intended only to get a sense of rough cost for the scope of work described and is acknowledged to be incomplete of the details and information required to provide a complete bid."

---

[6] "Writings referred to in a contract are construed as a part of the contract for the purpose and extent indicated."  *W.D. Nelson & Co. v. Taylor Heights Dev. Corp.*, 207 Va. 386, 391 (1966); *accord Condo. Servs. v. First Owners' Ass'n of Forty Six Hundred Condo., Inc.*, 281 Va. 561, 571 (2011).

We conclude that the purported contract is unambiguous because the relevant "provisions are capable of only one reasonable construction." *RECP IV WG Land Investors LLC*, 295 Va. at 283 (quoting *Wetlands America Trust, Inc.*, 291 Va. at 161). The April 30, 2021 document clearly defines the scope of the work to be completed as defined by *both* Exhibits A and B. If Exhibit B alone provided the scope of work as Ressa contends, Exhibit A's inclusion would be superfluous. Because we will not treat any contractual provision "as meaningless if a reasonable meaning can be given to it," and we follow the "presumption that the parties have not used words needlessly," *Wetlands Am. Trust, Inc.*, 291 Va. at 161 (quoting *Squire*, 287 Va. at 516), we give full weight to the parties' inclusion of Exhibit A. Additionally, the language of the contract unambiguously acknowledges that Exhibit A did not exist when the contract was signed. Thus, the only reasonable construction of the language that Exhibit A was "forthcoming" and would be "endorsed" by the parties is that the parties intended to prepare the document and reach an agreement on it together in the future.

Because the relevant provisions are unambiguous and "the intent of the parties can be determined from the language they employ[ed] in their contract, parol evidence respecting their intent is inadmissible." *Golding*, 261 Va. at 192-93. Our decision regarding the existence of an enforceable contract is thus limited to the four corners of the document and, in making that decision, we are "bound to say that the parties intended what the written instrument plainly declares." *Id.* at 192 (quoting *Magann Corp. v. Electrical Works*, 203 Va. 259, 264 (1962)).

As previously noted, for an enforceable agreement to exist, "[i]t is crucial . . . that the minds of the parties have met on every material phase of the alleged agreement." *Chittum*, 216 Va. at 467. In a service contract, the scope of work, i.e., "the nature and extent of service to be performed," is a material term. *Reid*, 259 Va. at 370. The contract in this case defined the scope of work by reference to an exhibit that did not yet exist and would need to be "endorsed" by the

parties once it was created. Thus, the terms of the contract plainly show that the parties did not have a meeting of the minds on that material term.

Ressa points to cases from other jurisdictions in which courts have held that preliminary plans were sufficiently definite to form the bases for enforceable agreements. *See Melbourne Leasing Co. v. Jack LaLane Fitness Centers, Inc.*, 621 N.Y.S.2d 682, 211 A.D.2d 765 (N.Y. App. Div. 1995); *Stangl v. Todd*, 554 P.2d 1316 (Utah 1976). The problem with Ressa's argument is that, unlike in those cases, the contract in this case did not define the scope of work by reference *only* to Ressa's preliminary estimate. Rather, the contract here explicitly defined the scope of work by reference to both the preliminary estimate *and* to the "forthcoming" permit approved plans. Thus, our holding should not be understood to imply that only final, county-approved permit plans can adequately describe the scope of work to make an enforceable construction contract. Indeed, in appropriate cases, "[t]he rights of the parties are to be measured and determined by the particular set of plans and specifications . . . upon which the contractor and subcontractor submitted their bid." *Worley Bros. Co. v. Marus Marble & Tile Co.*, 209 Va. 136, 143 (1968) (alteration in original) (quoting *Staley v. New*, 250 P.2d 893, 895 (N.M. 1952)). But in this case, Ressa explicitly defined the scope of work by reference to the permit approved plans, despite knowing that the plans did not yet exist.

Generally, "where a building contract refers to the plans and specifications and so makes them a part of itself, the contract is to be construed as to its terms and scope together with the plans and specifications." *Id.* (quoting *Staley*, 250 P.2d at 895). "And where the plans and specifications are by express terms made a part of the contract the terms of the plans and specifications will control with the same force as though incorporated in the very contract itself." *Id.* (quoting *Staley*, 250 P.2d at 895). By defining the contract in this case by reference to non-existent plans and specifications, the parties created an agreement with terms impossible to

enforce because the terms did not exist.  An agreement that "provide[s] no reasonable basis for affording a remedy for its breach[] . . . is too vague and indefinite to be enforced."  *Allen*, 222 Va. at 364.

"We are 'aware of the temptation' of courts to 'indulge in artificial interpretations or abnormal implications in order to save a party from a bad bargain.'"  *Babcock & Wilcox Co.*, 292 Va. at 189 (quoting 11 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 32:11, at 771-72 (4th ed. 2012)).  But "[w]e resist this temptation with the observation that our interpretative task is far simpler: 'It is the court's duty to declare what the instrument itself says it says.'"  *Id.* (quoting *Bentley Funding Group, L.L.C. v. SK&R Group, L.L.C.*, 269 Va. 315, 330 (2005)).  Our "guiding light" in contract interpretation is the intent of the parties as expressed by them in the words they have used in the contract.  *Golding*, 261 Va. at 193 (quoting *Magann Corp.*, 203 Va. at 264).  The words of the purported contract in this case express an unambiguous intent to define the scope of work in part by reference to a non-existent document.  Thus, there was no meeting of the minds as to the scope of work, a material term.  *Reid*, 259 Va. at 370.  Because there was no meeting of the minds on this material term, there was no enforceable agreement.  *See Golding*, 261 Va. at 194-95; *Chittum*, 216 Va. at 467; *see also, e.g.*, *King Lumber Co. v. National Bank of Summers*, 286 F. 906, 908 (4th Cir. 1923) (concluding parties' minds had not met on construction contract which referred to attached plans and specifications signed by the parties where no such mutually-approved plans existed).

CONCLUSION

Each of Ressa's assignments of error to the circuit court's decisions are explicitly conditioned on its argument that there was an enforceable agreement between it and the

Dillamans.  Because the purported contract failed to define the scope of the work, a material term, it was unenforceable.  Therefore, we affirm the circuit court's judgment.

*Affirmed.*